**CRAVENS et al. v. RETAIL CREDIT MEN'S ASS'N.**

District Court, M. D. Tennessee. October 29, 1924.

No. 43.

**1. Copyrights ⊂⊃86—Injunctive relief will not be granted to owner of rating list containing 3,000 names in bankruptcy list against defendant copying only 80 of such names.**

Injunctive relief will not be granted to owner of copyrighted book containing rating list of customers of subscribers, because out of about 3,000 names in plaintiff's bankruptcy list about 80 were copied by defendant, since the value of such copied matter is relatively small, compared with defendant's work acquired by original investigation.

**2. Copyrights ⊂⊃86—Owner of copyrighted rating list held not entitled to permanent injunction, where copied portion of defendant's publication has been eliminated.**

Owner of copyrighted rating list of customers of subscribers *held* not, under the facts, entitled to permanent injunction against defendant, who had copied a relatively small number of names of plaintiff's list, especially where defendant has eliminated copied portion from its publication.

**3. Copyrights ⊂⊃88—In suit to enjoin infringement of copyrighted rating list, facts held not to warrant reference.**

In suit to enjoin infringement of plaintiff's copyrighted rating list, case *held* not one for a reference, where defendant made no profits on its infringement, and no actual damages to plaintiff are provable.

**4. Copyrights ⊂⊃87—Statute providing $1 for every infringing copy held inapplicable, where number of infringements did not total 250 (17 USCA § 25).**

Act March 4, 1909, § 25 (17 USCA § 25), as amended by Act Aug. 24, 1912, par. 2, cl. (b), providing $1 for every infringing copy, *held* inapplicable, where number of infringing books issued by defendant did not total 250, since $250 is the absolute minimum under the statute.

**5. Copyrights ⊂⊃87—Replacement of obsolete infringing sheet of credit rating book with another infringing sheet would merely be a continuance or repetition of first infringement.**

Replacement of obsolete infringing sheet of defendant's loose leaf book with another sheet containing infringing matter would not constitute separate and distinct infringement, but would be a continuance or repetition of first infringement.

**6. Copyrights ⊂⊃87—Whether more than minimum sum for infringement of each copyright shall be granted is within court's discretion (17 USCA § 25).**

Whether court shall grant more than minimum damage of $250 for infringement of each copyright, as provided by Act March 4, 1909, § 25, as amended by Act Aug. 24, 1912, par. 2, cl. (b), being 17 USCA § 25, is within court's discretion.

26 F.(2d)—53

**7. Copyrights ⊂⊃87, 90—Plaintiff awarded minimum damages for infringement of each copyright and reasonable attorney's fees (17 USCA § 25).**

Plaintiff, suing for infringement of its copyrighted rating list book, *held*, under the facts, entitled only to minimum sum of $250 for infringement of each copyright, as provided by Act March 4, 1909, § 25, as amended by Act Aug. 24, 1912, par. 2, cl. (b), being 17 USCA § 25; but, in view of fact that defendant only withdrew its infringing matter under pressure of anticipated suit, plaintiffs are entitled to reasonable allowance for attorney's fees.

**8. Copyrights ⊂⊃90—Reference for attorney's fees in copyright infringement suit is discretionary with court.**

Question of reference for attorney's fees in suit for infringement of copyrighted rating list book is wholly discretionary with court.

In Equity. Bill by Henry L. Cravens and another against the Retail Credit Men's Association. Decree rendered.

Shepherd & Carden, of Chattanooga, Tenn., for plaintiffs.

Strang & Fletcher and Williams & Frierson, all of Chattanooga, Tenn., for defendant.

HICKS, District Judge. The plaintiff Blue Book Credit Company is a corporation, and the plaintiff Cravens owns its stock. The defendant Retail Credit Men's Association is also a corporation. Both plaintiffs and defendant are engaged in disseminating information to merchants regarding credit standing of their customers and prospective customers.

Cravens has been engaged in this business in Chattanooga for many years. His method is to procure subscribers and to distribute among them blank forms, upon which are certain symbols, and upon which forms the subscriber makes a record indicated by these symbols as to the credit standing of all his customers on which the subscriber reports to the plaintiff. The plaintiffs compile and publish this information annually in what is called the Blue Book. A copy of this Blue Book is delivered to each subscriber, not as a purchaser, but for his confidential use as a subscriber, and the subscriber agrees to hold the information contained therein in absolute confidence. In addition to the compiled information above set forth, this Blue Book has carried since 1898 a list of the bankrupts taken from the records of the United States District Court at Chattanooga.

In 1919 the Retail Credit Men's Association, the defendant in this case, was organized as a corporation, having in the main the same object and purposes as the plaintiffs'

concern, and in 1921 it also began the distribution of credit reports. This association consisted of merchants and some professional men of Chattanooga, and at the beginning the reports issued by it to its members consisted of mimeograph sheets containing in the main the same character of information as distributed by the plaintiffs. These sheets were finally changed to printed sheets and inserted in loose-leaf binders, and one loose-leaf binder contained all the sheets delivered to each member. This loose-leaf book was renewed once a year, by taking out of the book about monthly all names beginning with say two letters, and replacing in the book revised sheets touching all names beginning with the same letters. · The defendant's book also carried a list of bankrupts from December, 1921, which its employees compiled from the court record; ·but in 1923 defendant's manager, obtained a copy of the Blue Book and copied literally therefrom its list of bankrupts from 1898, and had the same printed and inserted in each of the loose-leaf books in the possession of its members. The plaintiffs also insist that the defendant has taken a large number of names from their bankrupt list and copied the same into its (the defendant's), rating lists, and further that the defendant has copied from plaintiffs' rating lists a large number of names with identical information into its (the defendant's) rating list.

[1] The defendant admits plaintiffs' copyright, and that it did, through Whitaker, copy plaintiffs' list of bankrupts from plaintiffs' Blue Book, and republish the same in its book; in other words, it admits a violation of the copyright law in this particular, but it denies it in all other particulars. The evidence leaves the question in so much doubt as to whether there was any copying, other than as admitted by the defendant, that the court is not satisfied to say that such copying is established by the weight of the evidence, except in the particular matters hereinafter mentioned.

It is true that plaintiffs present a list of some 80 names appearing in their bankrupt list, and which likewise appear in defendant's rating list with a star, and plaintiffs surmise that these 80 names were copied from their bankrupt list into defendant's rating list, and that the star indicates bankruptcy. Mr. Hansberger, manager of defendant, and Whitaker, who succeeded him as manager, both deny that any such thing was done. Whitaker says that the star does not necessarily mean bankruptcy, but that it indicates "special information." There are about 2,750 names in plaintiffs' 1922 bankruptcy list, and about 3,000 in their 1923 list, and it is hardly more probable that the defendant copied these 80 names out of either the 1922 or 1923 book of bankrupts than that it acquired them from an independent investigation; at least, one can hardly say that the weight of the evidence shows that these names were copied, and, even if they were, under the authority of Dun v. Lumbermen's Credit Association, 209 U. S. 20, 28 S. Ct. 335, 52 L. Ed. 663, 14 Ann. Cas. 501, the value of such copied matter is so relatively small as compared with the defendant's work acquired by original investigation as not to warrant an injunction. It is quite as probable that the names in defendant's rating list, and in connection with which the star is attached to the rating letter or letters, were acquired from independent investigation made by the defendant of the bankrupts from the District Court records from 1921, as otherwise. It is not seriously insisted, as I understand it, that the rating letters to which the star is attached were plagiarized. It is only insisted that the names themselves were copied, and that the star itself is a character of copying, in that it represents the same thing as found in plaintiffs' bankrupt list.

In support of plaintiffs' claim that a large number of names, with the accompanying information touching credits, was copied from its rating lists into defendant's rating lists, the plaintiffs file two lists of names, one containing 72 names and the other 26. The plaintiffs point out that the list containing 72 names, which is filed as Plaintiffs' Exhibit B, is identical in names and ratings with the same names and ratings found in defendant's book. This may be true as to some earlier edition or revision of defendant's book, but is not in fact true as to the defendant's book, which plaintiffs have filed as Exhibit I to the original bill. In fact, Mr. Cravens does not insist that it is true as to this book styled Exhibit I, which is the only defendant's book in evidence. Assuming that this list of 72 names is identical in names and ratings in plaintiffs' book and some earlier edition or revision of defendant's book, the situation presents some evidence of copying. Assuming that each has an unusually high standing with reference to prompt payment, it is nothing unusual that each should be reported with an "A" only. I use these names simply as an illustration, but it must be conceded as singular that, unless copying was done, there should be in each book exactly 12 A's as to Mr. ——, 15 A's as to Mr. ——, and 21 A's as to ——. Further, it is not particularly suspicious that, out of 17

CRAVENS v. RETAIL CREDIT MEN'S ASS'N 835


names in each list, each name should have the identical rating "E."

It must be kept in mind that both plaintiffs and defendant are engaged in the same character of work, upon the same general plan, and that if each concern, acting independently of each other, honestly and faithfully sought the exact facts as to each name reported on, the more faithfully and particularly each reflected the truth in its publication, the more nearly alike must be the reported result. But when one, upon a comparison of the two lists of the name with a rating in each book of 11A–4B, or the name with the identical rating in each of 6A–2B–5C, or the name with the identical rating of each of 4–A–2B, or the name with the identical rating in each of A–B–4C–E, and upon further reflection that defendant's manager admits having a copy of the Blue Book from which he copied the bankrupt lists, one cannot fail to arrive at the conclusion that as to some of the names, at least, in this list of 72, copying was done; and this cannot altogether be dispelled by the evidence presented by the defendant, showing that its master cards as to a large number of these names indicated the same or a larger number of reports than the rating list itself. Of course, there is a possibility that the identical result in the case of the names might have been arrived at by independent investigation, because the record shows that each party received reports from the same sources in some instances; but such an exact similarity in view of all the facts can hardly be accounted for upon this idea.

Neither can one be entirely satisfied that the incorrect name, "Strickland Patten Works," instead of the correct name, "Strickland Pattern Works," was brought into both lists as an innocent mistake. There is a possibility that it might have so happened, because of the same individual making the same incorrect report to each concern, and each concern keeping the incorrect name upon its master cards; but, in view of the fact that Whitaker had the Blue Book in his possession and did copy the bankrupt list, one can but conclude that the name "Strickland Patten Works" was copied. However, there is no evidence that the rating information following the words "Strickland Patten Works" was copied.

As to the other list of names submitted by the plaintiffs, upon which they claim an infringement, to wit, a list of 26 names, 15 of these names are given different rating or numbers of reports, 12 are given different addresses, and only 5 are given the same ratings

and addresses, and the ratings of these 5 in each book is of the highest credit. I cannot say, therefore, that as to this list the weight of the evidence shows infringement. Such a situation might have happened, where the parties were dealing with some 14,000 names in each case.

[2] No preliminary injunction was issued in the case, and I see no reason for a permanent injunction. Plaintiff had once a cause for injunction, but the occasion for it passed when the defendant eliminated from its publication the copied bankrupt list, and when it had so revised its book as that plaintiffs do now not show that any plagiarism is reflected in defendant's book, Exhibit I, except the bankrupt list, and when the defendant also delivered up to the court for destruction the copied bankrupt sheets and master cards.

[3] Nor does this case appear to me to be one appropriate for a reference as the record now stands. It is clear that the defendant made no profits upon its infringement. It is further clear that no actual damages to the plaintiff are provable by reason of the copied bankrupt list, or anything else held as an infringement in this opinion. It is true plaintiffs lost some subscribers. That is one thing. But it is entirely another thing to say that it lost subscribers or business because merchants subscribed for and accepted the pirated work of the defendant, rather than the plaintiffs' work. It is inconceivable that any one did so. Defendant's copied list of bankrupts was nothing more than a list of names, followed in some instances by the address of the bankrupt, and in some cases by his business or avocation. It contains no information touching the present financial standing or credit of the bankrupt, or the circumstances under which he failed; while each name in plaintiffs' list of bankrupts is followed by numerous symbols, to which, when the key to bankrupts found in the forepart of the book is applied, gives voluminous and valuable information as to the circumstances under which bankruptcy occurred.

[4] Neither is the measure of damages to be found in chapter 320, section 25, of the Acts of 1909, as amended by the Act of August 24, 1912, c. 256, cl. (b), par. second (17 USCA § 25), providing $1 for every infringing copy made of any work enumerated in section 5 of the act, or, as is set forth in said section 5, of any book, including composite and cyclopædic works, directories, gazetteers, and other compilations, because, without going into detail, in the view I take of the facts, under no circumstances did the defendant make or issue as large a number of books containing

infringements as 250, and $250 is the absolute minimum in all cases.

[5, 6] Even if the proof established that there was infringing matter in any obsolete sheet taken out of defendant's book, and that this obsolete sheet was replaced by another containing infringing matter, yet I cannot believe that this process would constitute separate and distinct infringements. I would merely regard such a situation as being a continuation or repetition of the first infringement. But we are faced with the situation that the defendant's conduct made it guilty of two infringements. The plaintiff had two copyrighted books, the date of the publication of the last one being July 5, 1923, and the affidavit prescribed by section 16 of the act having been received by the Register of Copyrights August 1, 1923, and the copies of books received August 2, 1923, as shown by the certificate of copyright filed as Exhibit E to complainants' bill, while the last published infringement shown in the record was August 16, 1923, as shown by the list of petitions in bankruptcy in the back of the defendant's book. The statute compels a minimum damage of $250 for infringement of each copyright. Westerman Co. v. Dispatch Co., 249 U. S. 105, 39 S. Ct. 194, 63 L. Ed. 499. Whether the court shall grant more than $250 for each infringement depends upon the court's view as to what damages are just. This is in accordance with the statute above cited.

[7, 8] Following the view hereinbefore expressed as to damages, I am of opinion that nothing further should be allowed than the minimum compelled by law, to wit, $250, for the infringement of each copyright, except that I am of opinion that, in view of the fact that defendant only withdrew its infringing matter under the pressure of a suit, or anticipated suit, under such circumstances plaintiffs should have a reasonable allowance for attorney's fees. I do not think a reference should be had for attorney's fees, as this is a matter wholly discretionary with the court. Upon a review of all matters which I feel should be taken into consideration in making this allowance, I conceive that the sum of $250 would not be improper for fees.

The final result, therefore, in this case, is that plaintiff will have a judgment for $750 and costs. It may occur to counsel that this allowance for fees is small; but, if so, it is because the court feels that the statutory damage of $250 for each infringement is rather large.

As to the defendant Howard, the suit is dismissed. If it might be said that Loveman & Co. forfeited its contract by a breach of confidence on the part of Howard in delivering this book to defendant's manager, yet the question here is: Did Howard directly or indirectly connive at or engage in the acts and conduct of Whitaker in publishing the infringement? I cannot find from the record that, when he delivered the book to Whitaker, he could even have anticipated that Whitaker intended to use it as an instrument for the violation of law.