**Donald DAVIS, Plaintiff,**

v.

**E. I. DuPONT de NEMOURS & COMPANY, Batten, Barton, Durstine & Osborn, Inc., Columbia Broadcasting System, Inc., Talent Associates, Ltd., David Susskind, Jacqueline Babbin and Audrey Gellen, Defendants.**

United States District Court
S. D. New York.
Jan. 20, 1966.

O'Brien, Driscoll & Raftery, New York City, for plaintiff; Paul D. O'Brien and Milton M. Rosenbloom, New York City, of counsel.

Coudert Brothers, New York City, for defendants; Carleton G. Eldridge, Jr., and Eugene L. Girden, Stephen S. Singer, New York City, of counsel.

FEINBERG, District Judge.

This proceeding grows out of a 1960 telecast of "Ethan Frome," which was shown on 162 television stations. The court has already held that the telecast infringed plaintiff Donald Davis's copyright in a dramatization of Edith Wharton's classic novel. Davis v. E. I. DuPont de Nemours & Co., 240 F.Supp. 612 (S.D.N.Y.1965). The proceeding now to fix damages raises the ultimate issue of what damages would be "just" under the applicable section of the Copyright Act, 17 U.S.C.A. § 101(b).

Davis v. E. I. DuPont de Nemours & Co., supra, contains a full discussion of the tangled copyright history of various versions of "Ethan Frome," the abortive negotiations before the offending telecast and the nature of the copyright infringement. The findings set forth in that opinion will not be repeated but should be regarded as incorporated herein. The facts that should be singled out in this proceeding to fix damages are, briefly, as follows. Defendants are E. I. DuPont de Nemours & Company ("DuPont"), sponsor of the infringing telecast; Bat-

ten, Barton, Durstine & Osborn, Inc. ("BBDO"), DuPont's advertising agency; Columbia Broadcasting System, Inc. ("CBS"), the network over which the program was televised; Talent Associates, Ltd. ("Talent"), producer of the telecast; David Susskind ("Susskind"), the Talent officer in charge of the production; and Jacqueline Babbin ("Babbin") and Audrey Gellen ("Gellen"), Talent employees who prepared the script. The infringing telecast occurred on February 18, 1960, as "The DuPont Show of the Month" over the facilities of CBS. Not more than twenty per cent of the program was pre-recorded on video tape; the balance was broadcast live. In the two months prior to the telecast, plaintiff Davis formally notified defendants twice that if they went ahead with the proposed television performance of "Ethan Frome" without his consent, they would be committing a deliberate copyright infringement.

CBS transmitted the infringing program from New York over 162 stations each of which telecast the program to its own specific audience. Almost all of the stations showed the program simultaneously. The fact that a few did not [1] has been ignored by the parties in urging their respective contentions and will be disregarded by the court. Each station was located in a different city; the locations ranged across the entire nation.[2] The total viewing audience for the program was over 17 million people.[3] Each local station broadcast not only the infringing program but also commercials transmitted to it by CBS for which the station received payment.[4] DuPont, through its advertising agency, BBDO, retained and exercised ultimate power to determine the content of the program.

DuPont sought nationwide coverage for the program through its dealings with CBS.[5] CBS made arrangements with those of its affiliated stations which agreed to broadcast the program when it was received from CBS. Each station had the choice of rejecting the proposed program.[6] A few stations were owned and operated by CBS;[7] the others were independently owned and operated, but were contractually affiliated with CBS.[8]

The damage issues here are raised within the legal framework of 17 U.S.C. § 101(b), which, in its present form, is an ambiguous hodgepodge of improvisations. This section states as follows:

If any person shall infringe the copyright in any work protected under the copyright laws of the United States such person shall be liable:

\* \* \* \* \*

(b) \* \* \* To pay to the copyright proprietor such damages as the copyright proprietor may have suffered due to the *infringement*, as well as all the profits which the infringer shall have made from *such infringement*, and in proving profits the plaintiff shall be required to prove sales only, and the defendant shall be required to prove every element of cost which he claims, or *in lieu of actual damages and profits, such damages as to the court shall appear to be just*, and in assessing such damages the court may, in its discretion, allow the amounts as hereinafter stated, but in case of a newspaper reproduction of a copyrighted photograph, such damages shall not exceed the sum of $200 nor be less than the sum of $50, and in the case of the infringement of an undramatized or nondramatic work

1. See Plaintiff's Exhibit (hereinafter cited as "Pl. Ex.") 35.

2. Ibid.

3. Stipulation on damage hearing, dated June 14, 1965 (hereinafter cited as "Stipulation"), p. 7.

4. Pl. Ex. 39; Stipulation, pp. 14–15.

5. Stipulation, pp. 6–7.

6. Stipulation, pp. 5–6.

7. Joint letter of counsel to court, dated June 16, 1965, p. 2.

8. The other stations had network contracts with CBS which gave them the first option to broadcast programs offered by the network. Pl. Ex. 38; Stipulation, pp. 3, 6.

by means of motion pictures, where the infringer shall show that he was not aware that he was infringing, and that such infringement could not have been reasonably foreseen, such damages shall not exceed the sum of $100; and in the case of an infringement of a copyrighted dramatic or dramatico-musical work by a maker of motion pictures and his agencies for distribution thereof to exhibitors, where such infringer shows that he was not aware that he was infringing a copyrighted work, and that such infringements could not reasonably have been foreseen, the entire sum of such damages recoverable by the copyright proprietor from such infringing maker and his agencies for the distribution to exhibitors of such infringing motion picture shall not exceed the sum of $5,000 nor be less than $250, and *such damages shall in no other case exceed the sum of $5,000 nor be less than the sum of $250,* and shall not be regarded as a penalty. But the foregoing exceptions shall not deprive the copyright proprietor of any other remedy given him under this law, nor shall the limitation as to the amount of recovery apply to infringements occurring after the actual notice to a defendant, either by service of process in a suit or other written notice served upon him.

First. In the case of a painting, statue, or sculpture, $10 for every infringing copy made or sold by or found in the possession of the infringer or his agents or employees;

Second. In the case of any work enumerated in section 5 of this title, except a painting, statue, or sculpture, $1 for every infringing copy made or sold by or found in the possession of the infringer or his agents or employees;

Third. In the case of a lecture, sermon, or address, $50 for every infringing delivery;

Fourth. In the case of a dramatic or dramatico-musical or a choral or orchestral composition, $100 for the first and $50 for *every subsequent infringing performance;* in the case of other musical compositions $10 for every infringing performance; (Emphasis added.)

The parties have stipulated that because the "rules of law and evidence render difficult proof of plaintiff's actual damages, if any, and proof of profits, if any, of the defendants" due to the infringing telecast, plaintiff relies solely upon the "in lieu of" provisions quoted above,[9] commonly referred to as the statutory damage provisions. Accordingly, plaintiff does not claim and has not proved actual damages or profits and seeks to recover only such damages under the above quoted statutory language "as to the court shall appear to be just." Plaintiff argues that this amount is $211,-500, computed in a manner set forth below, and, in any event, can be no less than $40,500. Defendants contend that damages can be no higher than $8,150 and should be fixed at a lower figure.

The basic issues before the court are: (1) whether the 1960 telecast by 162 stations was one "infringement" by these defendants or 162, thereby determining whether the minimum statutory damage is $250 or $40,500; (2) if there was only one infringement, whether the maximum damage is the $5,000 limit set forth in 17 U.S.C. § 101(b), or whether this is inapplicable because defendants had "actual notice" of the copyright claim; and (3) in any event, at what figure "just" damages should be fixed.

I

The statutory damage provisions provide a minimum of $250 and a maximum of $5,000 for each infringement. Plaintiff contends that there were 162 infringements of his copyright and there-

fore the minimum damage must be 162 times $250, or $40,500. Defendants claim that there was only one infringement of the copyright and the applicable minimum is accordingly only $250. Whether a simultaneous network telecast by many stations constitutes more than one infringement is remarkably unclear. As is so often the case in copyright actions, although the issue raised is far reaching in import, there are few, if any, decisions on point and none containing any extended discussion of the problem.[10]

Any careful analysis of the issue must begin with close examination of section 101(b). That section states that any person who infringes a copyright shall be liable to pay to the copyright proprietor damages due to "the infringement" as well as profits made by the infringer "from such infringement," or in lieu of actual damages and profits, such damages as appear just to the court. The limits on the "in lieu of," or statutory, damages are that they shall in no "case" exceed $5,000 or be less than $250, with an exception as to the maximum to be discussed below. The law is clear that an award as statutory damages of any amount from $250 to $5,000 for an infringement is within the discretion of the trial court.[11] In situations where repetitive infringement of a copyrighted work is probable, the statute suggests amounts ("yardstick amounts") to guide the court in the exercise of its discretion. Thus, the yardstick amounts for "a dramatic composition" like the Davis play infringed here are $100 for the first and $50 "for every subsequent infringing performance." Clearly, then, the statutory scheme contemplates that one "infringement" may nevertheless result in more than one "performance" and that in fixing damages for such infringement between the $250 minimum and the $5,000 maximum, the court may consider the number of infringing performances and the suggested yardstick amount for each one. Conversely, more than one performance does not require a finding of more than one "infringement" to each of which a minimum of $250 damages would apply.

On the first issue—whether the network telecast over 162 stations was one infringement by these defendants or 162 —the cases are not truly helpful. In Law v. National Broadcasting Co., 51 F.Supp. 798 (S.D.N.Y.1943), plaintiff sued for copyright infringement of a song which had been performed on radio on three occasions over a total of 218 stations. Through the National Broadcasting network, sixty-seven radio stations simultaneously broadcast the song the first time and, in two later years, sixty-six stations and eighty-five stations, respectively, broadcast it. The court did not discuss whether there were three or 218 infringements, but focused on the yardstick amount for infringing performances which, in the case of a musical composition, is $10 for each performance.[12] It fixed damages at 218 times $10, or $2,180, rejecting defendants' argument that damages amounted only to $30 on the theory that each of the three network broadcasts should be considered only one yardstick performance. It is not clear whether the court regarded the three network broadcasts as one infringement or three (to which a minimum of $750 and a maximum of $15,000 would apply). It is clear, however, that the court did not regard each broadcast by each radio station as a separate infringement because it did not apply a multiplier of 218 to the statutory minimum of $250 to reach minimum damages of $54,500. The court's entire discussion of the point was as follows (51 F.Supp. at 799):

> Under all the circumstances, I feel it to be only just and fair to assess

---

10. See Shapiro, Bernstein & Co. v. H. L. Green Co., 316 F.2d 304, 305 (2d Cir. 1963).

11. Douglas v. Cunningham, 294 U.S. 207, 210, 55 S.Ct. 365, 79 L.Ed. 862 (1935).

12. See p. 332 supra for statutory language.

against the defendants the sum of $10 for each infringing performance. In coming to this conclusion, I have taken into consideration that there were 85 performances after notice was given.

Plaintiff's composition was performed on three occasions by the NBC with chain hook-ups of 67, 66 and 85 stations, in all 218. Damages should be awarded on the theory that there were 218 performances, not three. Buck v. Jewell-La Salle Realty Co., 283 U.S. 191, 51 S.Ct. 410, 75 L.Ed. 971.

In Buck v. Jewell-LaSalle Realty Co., 283 U.S. 191, 51 S.Ct. 410 (1931) (*"Jewell-LaSalle I"*), relied upon by the court in *Law*, a radio station played two copyrighted songs without permission. A hotel in the same city, through a master receiving radio set, picked up the songs and transmitted them simultaneously by wire throughout public areas and many private rooms of the hotel. Buck, as president of the American Society of Composers and Publishers ("ASCAP"), sued the owner of the radio station and Jewell-LaSalle Realty Co., owner of the hotel, for an injunction and damages for copyright infringement.[13] The Supreme Court, in response to a question certified to it by the Court of Appeals for the Eighth Circuit, held that the acts of the hotel in making available to its paying guests through loudspeakers in hotel rooms an audible rendition of a copyrighted musical composition constituted a performance of the composition within the meaning of 17 U.S.C. § 1(e). This section defines the scope of a copyright proprietor's exclusive performing rights in musical compositions. The Court was faced with the argument that since the radio station was liable for the unauthorized performance of the copyrighted song, the hotel could not be liable too.

Responding to this contention, the Court stated (283 U.S. at 198, 51 S.Ct. at 411):

> But nothing in the Act circumscribes the meaning to be attributed to the term "performance," or prevents a single rendition of a copyrighted selection from resulting in more than one public performance for profit. While this may not have been possible before the development of radio broadcasting, the novelty of the means used does not lessen the duty of the courts to give full protection to the monopoly of public performance for profit which Congress has secured to the composer. Compare Kalem Co. v. Harper Bros., 222 U.S. 55, 63 [32 S.Ct. 20, 56 L.Ed. 92]. No reason is suggested why there may not be more than one liability.

*Jewell-LaSalle I* was authority for the holding in *Law* that there could be 218 performances growing out of three network broadcasts. However, *Jewell-LaSalle I* did not deal with the issue of whether a simultaneous broadcast over many stations is more than one "infringement" under 17 U.S.C. § 101(b), as well as more than one "performance."

Shortly after the decision in *Law*, another case in this court arose out of a simultaneous broadcast by two radio stations. In Select Theatres Corp. v. Ronzoni Macaroni Co., 59 U.S.P.Q. 288 (S.D. N.Y.1943), plaintiffs were the copyright proprietors of the play, "Death Takes A Holiday," in its original Italian form and in its English versions. Various episodes illegally copied from the plays were broadcast at different times over a New York radio station owned by defendant International Broadcasting Corporation. This station transmitted the episodes to another radio station in Philadelphia, owned by defendant William Penn Broadcasting Corporation, which broadcast each episode simultaneously.[14] On the issue pertinent here,

---

13. See Buck v. Duncan, 32 F.2d 366 (W.D. Mo.1929), rev'd with respect to infringement by radio after certification sub nom. Buck v. Jewell-LaSalle Realty Co., 51 F.2d 726 and 730 (8th Cir. 1931).

14. See Findings of Fact and Conclusions of Law, Select Theatres Corp. v. Ronzoni Macaroni Co., Civil No. 10–216, S.D.N.Y., May 29, 1944.

the court regarded the simultaneous broadcasts by the New York and Philadelphia stations as two separate series of infringements. E. g., for three broadcasts by each station of episodes from the Italian version, judgments were entered for two separate sums of $750 (three times $250), one against International Broadcasting Corporation and the other against William Penn Broadcasting Corporation.[15] Presumably, the *Ronzoni* court regarded each broadcast over the two stations as entitling the plaintiff to minimum damages of $500 (two times $250), each station to pay plaintiff $250. Unless controlling significance is given to the fact that both stations were actually sued in *Ronzoni* and only the network was sued in *Law*, the two cases appear inconsistent; e. g., a radio broadcast in *Law* over sixty-seven stations resulted in statutory damages of $10 a performance (or $670), rather than sixty-seven times $250. However, again in *Ronzoni* there was no discussion of the problem; the only authority cited on the point was *Jewell-LaSalle I* and Society of European Stage Authors & Composers, Inc. v. New York Hotel Statler Co., 19 F.Supp. 1 (S.D.N.Y.1937). *Jewell-La-Salle I* has already been discussed, supra. In *Statler*, as in *Jewell-LaSalle I*, defendant hotel used a master receiving set, picked up a broadcast of a song, and replayed it through speakers in private rooms of the hotel. The hotel sought to distinguish *Jewell-LaSalle I* because, *inter alia*, the original broadcast it picked up from station WJZ was licensed to that station by the copyright owner. However, the court held the hotel liable for copyright infringement. The case is not significant for the basic issue under examination here.

There have been other Supreme Court copyright cases in which the issue may have been present but was either not raised or not decided. Thus, in the language quoted from *Jewell-LaSalle I*, supra,[16] the Court referred to Kalem Co. v. Harper Bros., 222 U.S. 55, 63, 32 S.Ct. 20, 56 L.Ed. 92 (1911). In that case, the owner of the copyright on the book "Ben Hur" sued the Kalem Company, a producer and distributor of motion pictures. Defendant Kalem did not exhibit the allegedly offending motion picture itself but had distributed it to theaters throughout the country, where the film had been shown over 500 times.[17] Plaintiff sought only injunctive relief, which was granted by the trial court. On appeal, the decree was affirmed both by the circuit court, 169 Fed. 61 (2d Cir. 1909), and the Supreme Court, 222 U.S. 55, 32 S.Ct. 20 (1911). The chief issue in the Supreme Court was whether the showing of the film constituted an infringement of the copyright by Kalem; none of the courts in that litigation dealt with the question of whether Kalem was liable in damages for a series of infringements (at least one by each theater).[18]

The statutory damage provisions of 17 U.S.C. § 101(b) were scrutinized by the Supreme Court in Jewell-LaSalle Realty Co. v. Buck, 283 U.S. 202, 51 S.Ct. 407, 75 L.Ed. 978 (1931) (*"Jewell-LaSalle II"*), which grew out of the same lower court litigation as *Jewell-LaSalle I*, supra, and was decided the same day. In *Jewell-LaSalle II*, the claimed copyright infringement was by a live rendition given

---

15. Id. at 10; Order of the Court, Select Theatres Corp. v. Ronzoni Macaroni Co., June 7, 1944, at 3. Two similar judgments with respect to broadcasts of seventeen additional episodes infringing one English version were entered for $4,250 against each station.

16. P. 334 supra.

17. Transcript on Appeal, p. 35, Harper & Bros. v. Kalem Co., 169 F. 61 (2d Cir. 1909).

18. Cf. Universal Pictures Co. v. Harold Lloyd Corp., 162 F.2d 354, 378 (9th Cir. 1947) (apparently neither plaintiff nor court considered argument that showings of the offending film in each of 6,636 theaters constituted separate infringements).

by an orchestra at the LaSalle Hotel, rather than by the pickup and replay of a radio broadcast.[19] The hotel admitted this infringement, leaving the trial court with the sole question of whether to award minimum damages of $250 or $10. The court awarded the larger sum. Buck v. Duncan, 32 F.2d 366, 368 (W.D.Mo. 1929). Defendant argued in the Supreme Court that since there was only one unauthorized performance of the song in question, plaintiffs were entitled to only $10 statutory damages, relying upon the yardstick amount quoted above.[20] The Supreme Court held that the minimum damage for the infringement was $250 and that the yardstick amount of $10 for every infringing performance could be applied in the discretion of the court only when the number of infringing performances exceeded twenty-five. As previously noted, in *Jewell-LaSalle II*, only the hotel orchestra was involved, and there was no rebroadcast of a radio program. Obviously, therefore, the Court had no occasion to deal with the question of whether there was more than one infringement, which would require application of more than $250 minimum damages.

In *Jewell-LaSalle II*, the Court relied upon its earlier decision in L. A. Westermann Co. v. Dispatch Printing Co., 249 U.S. 100, 39 S.Ct. 194, 63 L.Ed. 499 (1919). That case involved newspaper publication of six separately copyrighted pictorial illustrations. The Court found seven infringements. Five of the infringements consisted of reproduction in defendant's newspaper on five different occasions of a different copyrighted illustration. Of significance here, the Court found two additional infringements because defendant twice published (twenty-six days apart) plaintiff's sixth copyrighted illustration. Accordingly, the Court held that a minimum of $250 damages for each of the seven infringements

had to be awarded. The Court explained (249 U.S. at 105–106, 39 S.Ct. at 195):

> The statute says that the liability thus defined is imposed for infringing "the copyright in any" copyrighted "work." The words are in the singular, not the plural. Each copyright is treated as a distinct entity, and the infringement of it as a distinct wrong to be redressed through the enforcement of this liability. Infringement of several copyrights is not put on the same level with infringement of one. On the contrary, the plain import of the statute is that this liability attaches in respect of each copyright that is infringed. Here six were infringed, each covering a different illustration. Thus there were at least six cases of infringement in the sense of the statute. Was there also another? The illustration covered by one of the copyrights was published on two separate occasions, each time in a different advertisement. There was no connection between the two advertisements other than the inclusion of the same illustration in both. Each was by a different advertiser and was published at his instance and for his benefit. The advertisers were not joint, but independent, infringers, neither having any connection with what was done by the other. By publishing their advertisements, the defendant participated in their independent infringements. In these circumstances, we think the second publication of the illustration must be regarded as another and distinct case of infringement. Whether it would be otherwise if that publication had been merely a continuation or repetition of the first, and what bearing the "third" and "fourth" subdivisions of § 25 [now § 101], before quoted, would have on the

---

19. See 283 U.S. at 203, 51 S.Ct. 407 ("orchestral performance"). This is more clearly brought out by references to "Count 7 of Case No. 1207" in Buck v. Duncan, 32 F.2d 366, 368 (W.D.Mo.

1929), and "the seventh count" in Buck v. Jewell-LaSalle Realty Co., 51 F.2d 730 (8th Cir. 1931).

20. See p. 332 supra.

solution of that question, are matters which we have no occasion to consider now. They are mentioned only to show that no ruling thereon is intended.

The language of the Supreme Court focusing on the seventh infringement is significant here. The Court pointed out that the sixth illustration "was published on two separate occasions, each time in a different advertisement." It also stressed that there was no connection between the advertisements or the advertisers who placed them. Under these circumstances, the Court concluded that the second publication of the illustration "must be regarded as another and distinct case of infringement." However, it expressly left open for future decision whether the result would be the same if the second publication "had been merely a continuation or repetition of the first," having in mind the yardstick amounts.

After the decision in *Westermann*, a number of courts faced the problem of whether succeeding publications each constituted a separate "infringement" for the purpose of computing minimum dam-

ages. It has been suggested that although these decisions seem, upon superficial examination, to conflict with each other, they actually show the following consistent pattern:[21] if the interval between succeeding publications is merely a matter of days, the courts will consider all the publications as one infringing transaction, which requires application of one minimum damage award; conversely, if the time lag between succeeding publications is longer, then each publication will be viewed as a separate infringement requiring separate minimum damages.[22] It has also been suggested that the nature of the business transaction giving rise to the infringement is significant, implying that a single integrated business transaction would result in one infringement, while separate and distinct transactions would result in more than one.[23]

The most recent decision in the Supreme Court construing the statutory damage provisions is F. W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 73 S.Ct. 222, 97 L.Ed. 276 (1952). In that case, suit was brought for in-

21. See Nimmer, Copyright § 154.32 at 689 (1964).

22. Compare, e. g., Gordon v. Weir, 111 F.Supp. 117 (E.D.Mich.1953), aff'd per curiam, 216 F.2d 508 (6th Cir. 1954) (e. g., publications "during February" one infringement); Doll v. Libin, 17 F.Supp. 546 (D.Mont.1936) (publications on April 17, 19, 22 and 24 and May 5), (Contra, Advertisers Exchange, Inc. v. Bayless Drug Store, Inc., 50 F.Supp. 169 (D. N.J.1943) (separate infringements for publications on April 2 and 3).) with, e. g., Burndy Engineering Co. v. Sheldon Service Corp., 127 F.2d 661 (2d Cir. 1942) (time intervals of publications varied from three weeks to over six months. Record on Appeal, p. 275); Harry Alter Co. v. A. E. Borden Co., 121 F.Supp. 941 (D.Mass.1954) (three publications in 1945, 1948 and 1950, respectively); Eliot v. Geare-Marston, Inc., 30 F.Supp. 301 (E.D.Pa.1939) (two publications in May 1936 and January 1937, respectively).

23. In Cory v. Physical Culture Hotel, Inc., 14 F.Supp. 977, 985 (W.D.N.Y.1936),

aff'd, 88 F.2d 411 (2d Cir. 1937), the court stressed that:

Each issue of the magazine was a separate and distinct set-up involving a new and independent arrangement of copy and advertising matter and a printing based on a separate and distinct order in each case, unrelated to the order for any preceding edition or printing. Although the court held that each separate printing "constituted a separate infringement," it left open whether this required application of separate minimum and maximum limits to the seven infringements involved in that case. Ibid. Cf. Gordon v. Weir, 111 F.Supp. 117, 123 (E.D.Mich.1953), aff'd per curiam, 216 F.2d 508 (6th Cir. 1954) (operating methods of plaintiff examined to justify finding of only one infringement for several publications); Doll v. Libin, 17 F.Supp. 546 (D.Mont.1936) (five copyrighted advertisements published after contract expired constituted one infringement) ; Cravens v. Retail Credit Men's Ass'n, 26 F.2d 833, 836 (M.D.Tenn. 1924) (infringing replacement pages in a loose-leaf book not separate infringements).

fringement of a copyrighted work of art entitled "Cocker Spaniel in Show Position." Plaintiff, assignee of the copyright, made small sculptures and figurines among which were statues of a cocker spaniel, and marketed them chiefly through gift and art shops. Defendant Woolworth bought 1,524 cocker spaniel statues from a different source and distributed them through thirty-four Woolworth stores. These statues had been illegally copied from plaintiff's verson, although Woolworth was not aware of this. The issue before the Supreme Court was whether the trial court had properly allowed statutory damages in the amount of $5,000, even though there was proof that Woolworth's gross profit on the sale of the dogs was under $900. Woolworth argued in the Supreme Court that it was error to apply the statutory damage maximum because actual profits in a lesser amount had been proved. Affirming, the Court held (7–2) that such proof did not foreclose the trial court from using the statutory damage provisions and in its discretion awarding maximum damages. The dissent disagreed and characterized the $5,000 award as a "manifestly unjust exaction." Both the majority and dissenting opinions assumed that the minimum and maximum damages for only one infringement were applicable.

Turning from Supreme Court and other copyright cases to analogies from other fields of law seems unfruitful. Thus, common law definitions of joint tortfeasors—in themselves frequently inconsistent—are of limited utility in construing an act where complex wrongs and remedies are intertwined and unique.[24] The analogy of mass media defamation, though tempting, is unhelpful for the same reason and, in addition, raises more problems than it solves.[25]

Thus, a review of the cases indicates that there is no binding precedent in point on the issue of whether a network telecast over 162 stations constitutes one infringement or 162. At the trial court level, Law v. National Broadcasting Co., supra, and Select Theatres Corp. v. Ronzoni Macaroni Co., supra, involved simultaneous radio broadcasts but reached inconsistent results. In the Supreme Court, the problem of multiple infringement was implicit in the *Kalem* case, where a motion picture distributor was held liable as a contributory infringer for the public exhibition of films in various theaters, but no issue of damages was dealt with in the litigation. In *Westermann*, the Supreme Court recognized, but did not deal with, the question of whether a second publication which was "merely a continuation or repetition of the first" would be another infringement. Since then, in cases involving publishing and printing rights, some courts have regarded as significant the interval between publications or have examined the nature of the business transaction giving rise to the infringement. If the theory of those cases is applied to performing rights, it suggests that a simultaneous telecast by many stations over one network gives rise to only one infringement. In any event, it is accurate to describe the case law as inconclusive.

With this in mind, it is appropriate again to focus on the statute, with particular reference to its legislative history. The statutory language has

24. See Note, Joint and Several Liability for Copyright Infringement: A New Look at Section 101(b) of the Copyright Act, 32 U.Chi.L.Rev. 98, 118–121 (1964).

25. See 1 Harper & James, Torts § 5.16 (1956). If anything, the single publication rule, formulated in part to prevent a multiplicity of suits from springing out of a single set of defamatory activities, suggests that a simultaneous network telecast should be considered a single infringement by the network and these co-defendants. But apparently, borrowing the single publication rule would still leave unanswered the question of under what circumstances separate stations could be sued individually. See Developments in the Law—Defamation, 69 Harv.L.Rev. 875, 947–950 & 948 n. 516 (1956); consider also id. at 950–951.

been analyzed above, and it was there concluded that 17 U.S.C. § 101(b) clearly contemplates that several performances may amount to only one "infringement." The minimum of $250 and the maximum of $5,000 for any infringement and the yardstick amounts have remained unchanged since the general revision of the Copyright Act in 1909. Since then, two additional damage provisions have been enacted dealing with infringement by a medium of mass communication. After the litigation in *Kalem,* supra, which decided that a motion picture could violate the copyright on a novel, the Act was amended in 1912. The amendment provided that in the case of innocent infringement by means of motion pictures embodying a nondramatic or undramatized copyrighted work, the statutory damages should not exceed $100, and for similar infringment of a dramatic work "the entire sum" of damages recoverable by a copyright proprietor from a "maker of motion pictures and his agencies for distribution thereof to exhibitors" should not exceed $5,000.[26] This amendment has been characterized as "intended to rectify" the Supreme Court decision in *Kalem.*[27] Another limitation of the statutory damage provisions was added in 1952 to cover damages for infringement by radio of nondramatic literary works.[28] This section, which has been placed in 17 U.S.C. § 1(c), rather than in section 101(b), provides that:

> The damages for the infringement by broadcast of any work referred to in this subsection shall not exceed the sum of $100 where the infringing broadcaster shows that he was not aware that he was infringing and that such infringement could not have been reasonably foreseen; * * *.

While there has been no other applicable legislation, the issue posed by the instant case has not gone unnoticed by those expert in the field. Thus, in one of the studies recently published under the auspices of the Register of Copyrights,[29] it was pointed out that "it is not clear how many infringements are involved when a copyrighted work * * * [is] used in successive editions or broadcasts, or in simultaneous broadcasts," and that "there is therefore good reason for some uncertainty about the extent of statutory liability for multiple infringements * * *."[30] Moreover, there have been proposals in Congress in the past few decades to clarify the situation. However, none of these bills was enacted. More recently, there has been a series of hearings and conferences which may lead to further revision of the copyright law. The most recent bill under examination is apparently designed to put a lim-

---

26. Pub.L. No. 303, 62d Cong., 2d Sess., 37 Stat. 489 (1912). This language, which presently appears in 17 U.S.C. § 101(b), is quoted at p. 331 supra. The same amendment also added the provision lifting the $5,000 maximum when written notice is given.

27. See Warner, Radio and Television Rights § 163 at 650 (1953):
This provision was intended to rectify the Supreme Court's decision in *Kalem Co.* v. *Harper,* where the exhibition of the motion picture by 10,000 innocent exhibitors resulted in 10,000 separate infringing performances.
As indicated above (p. 335), the courts in the various stages of the *Kalem* case did not discuss whether more than one "infringement" was involved.

28. Pub.L. No. 575, 82d Cong., 2d Sess., 66 Stat. 752 (1952).

29. Subcomm. on Patents, Trademarks, and Copyrights, Sen. Comm. on the Judiciary, 86th Cong., 2d Sess., Copyright Law Revision Study No. 23 (studies hereinafter cited as, e. g., "Study No. 23"), Brown, The Operation of the Damage Provisions of the Copyright Law: An Exploratory Study 77–80 (Comm. Print 1958).

30. Id. at 79–80. See also id. at 81, referring to the limitation in section 1(c) of $100 for certain infringements by radio:
With respect to the determination of multiple infringements by a network broadcast, will the $100 limitation be controlling, or will "the infringing broadcaster" be held to refer to each outlet? If there are multiple infringements in such a situation, would each outlet have to be sued separately, precluding recovery from the network for all the claimed infringements?

it of $20,000 on possible liability for simultaneous infringing telecasts,[31] although there is conflict in testimony at the hearings as to the advisability of doing so.[32]

■ None of this, of course, resolves the question of how section 101(b) in its present form should be interpreted. The 1912 and 1952 amendments, putting limits on possible multiple liability for motion pictures and radio broadcasts under certain circumstances, might be urged as a recognition that the law requires piling minimums upon each other in those analogous situations (such as network telecasts) where Congress has not acted. However, the legislative history of the 1912 amendment, at least, indicates that it was enacted not in apprehension of multiple infringements; rather, it was designed to prevent excessive awards based on numerous yardstick performances in movie theaters apparently assumed to be involved in only one infringement.[33] In addition, for the limited significance of later statutes in construing an earlier one, see SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 199–200, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). On the other hand, the specter of multiple infringements occasioned by the advance of technology in motion pictures, radio and television has existed for quite a while. It can be plausibly argued that one reason for congressional inaction is an awareness that the courts are reluctant to construe the statute as requiring an automatic multiplication of minimum liabilities. Thus, the Register of Copyrights has recently pointed out: [34]

We believe that the danger of exorbitant awards in multiple infringement cases is more theoretical than real. In a few cases involving multiple infringements—e. g., where various items in a copyrighted merchandise catalog were reproduced in a series of infringing catalogs—the courts have used this formula of multiplying the number of infringements by $250, but they did so to reach a result they thought just. We know of no case in which the court has felt constrained to use this formula where the resulting total was considered excessive. The present statute, however, is not clear on this point. It is conceivable that a court might construe the statute as requiring the use of this formula in multiple-infringement cases.

Legislative intent is often elusive; frequently, that best that a court can do is make an educated guess. Here, the statute is over half a century old and was enacted long before any Congressman ever heard of a nationwide telecast. Under such circumstances, a judgment as to what Congress meant (or would have meant had the problem been posed) is

31. Various earlier legislative proposals are discussed in Study No. 22 at 20–29 (1956) and Study No. 25 at 149–52 (1958). The latest bill is S. 1006, H.R. 4347, H.R. 5680, H.R. 6831, H.R. 6835, 89th Cong., 1st Sess. § 504(c) (1965), reprinted in House Comm. on the Judiciary, 89th Cong., 1st Sess., Copyright Law Revision, Part 6, Supplementary Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law: 1965 Revision Bill 274 (Comm. Print 1965) (hereinafter cited as "Copyright Revision, Part 6"); see id. at 136–138.

32. Compare House Comm. on the Judiciary, 88th Cong., 2d Sess., Copyright Law Revision, Part 4, Further Discussion and Comments on Preliminary Draft for Revised U. S. Copyright Law 136, 148–149, 164 (Comm. Print 1964);

House Comm. on the Judiciary, 89th Cong., 1st Sess., Copyright Law Revision, Part 5, 1964 Revision Bill with Discussions and Comments 201–202, 269 (Comm. Print 1965); Copyright Revision, Part 6 at 136–138. Although some of these comments were specifically directed to legislative proposals made in 1964, they are equally applicable to the 1965 bill.

33. S.Rep. No. 906, H.R.Rep. No. 756, 62d Cong., 2d Sess. (1912) (identical reports); 48 Cong.Rec. 8288–8291 (1912) (remarks of Representative Townsend, sponsor of the amendment).

34. House Comm. on the Judiciary, 87th Cong., 1st Sess., Register of Copyrights, Copyright Law Revision Report 105 (Comm. Print 1961) (hereinafter cited as "Register's Report").

even more tentative. Taking all of the above into consideration, it appears that the legislative history of the statute, like the case law, is not determinative of the issue presented here. However, section 101(b), in clearly providing that many performances of a copyrighted work may result in only one infringement, indicates that it does not require a mechanical adding together of 162 simultaneous telecasts to produce 162 separate infringements.

With neither conclusive precedents nor legislative guidance, the competing policies underlying the contending positions of the parties become more significant. Under the copyright law, plaintiff is undoubtedly entitled to protection for his independent creation, but the protection should be appropriate.[35] The Copyright Act should certainly not be lightly interpreted in a manner likely to produce ridiculous results.[36] Thus, if an innocent but nonetheless infringing network played even a portion [37] of a copyrighted melody only once on a network broadcast of 200 stations, plaintiff's construction of section 101(b) would require the network to pay a minimum of $50,000 (200 times $250). Is the risk of such an outlandish result required, however, to protect adequately a copyright in a work of more substantial value, such as the infringed play in this case? In other words, is there a real danger that unless the multiple-infringement theory is mandated, the $5,000 maximum for one infringement will work hardship on the copyright proprietor of a very valuable work? As a practical matter, the answer is probably not. The statutory damage provision (including the maximum) only ap-

plies where plaintiff is unable to prove actual damages and profits. In many instances, a plaintiff will be able to offer such proof.[38] Moreover, if a radio or television network has written notice of a copyright claim, then the maximum of $5,000 for each infringement does not apply. In other words, if such notice has been given, a multiplication of infringements to pile up high minimum statutory damages and (by hypothesis) a more equitable damage figure is not necessary because the court is not bound by the maximum of $5,000.[39] In view of advance announcement of network program schedules, it seems likely today that notice will usually have been served when a network broadcasts a program infringing a quite valuable copyrighted work. Thus, the significance of a failure to find multiple infringements in this case is materially lessened by the holdings in Points II and III, infra.

Plaintiff points out that the statutory damage provisions have a deterrent, as well as a compensatory, purpose and argues that a finding of multiple infringements is necessary "to discourage wrongful conduct." See F. W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 233, 73 S.Ct. 222, 97 L.Ed. 276 (1952).[40] However, the cases neither minimize the compensatory statutory purpose nor indicate that deterrence should be carried to an extreme by converting a $250 incentive to sue into a windfall. Id. at 231, 73 S.Ct. 222; see L. A. Westermann Co. v. Dispatch Printing Co., 249 U.S. 100, 108, 39 S.Ct. 194, 63 L.Ed. 499 (1919). Requiring a mechanical application of a rule of multiple minimum damages for

---

35. See generally Chafee, Reflections on the Law of Copyright, 45 Colum.L.Rev. 502, 506–14 (1945).

36. For an example of how courts anxious to avoid awarding enormous multiple-minimum statutory damages have found more attractive alternatives, see Shapiro, Bernstein & Co. v. Bleeker, 224 F.Supp. 595, 243 F.Supp. 999 (S.D.Cal.1963 and 1965, respectively).

37. See Warner, op. cit. supra note 27, § 154 at 573–575, § 163 at 663, and authorities cited therein.

38. Cf. Universal Pictures Co. v. Harold Lloyd Corp., 162 F.2d 354, 368–370 (9th Cir. 1947) (suggesting actual damages can be proven without great difficulty).

39. See Points II and III infra for a discussion of the authorities.

40. Plaintiff also cites Douglas v. Cunningham, 294 U.S. 207, 55 S.Ct. 365, 79 L.Ed. 862 (1935), and Peter Pan Fabrics, Inc. v. Jobela Fabrics, Inc., 329 F.2d 194 (2d Cir. 1964).

each network broadcast or telecast could, as indicated above, at times have absurd results. On the other hand, retaining flexibility with respect to minimum damages would not destroy the deterrent effect of any award since it would rarely, if ever, as a practical matter, require a court to undercompensate a plaintiff. Plaintiff's deterrence argument really applies only to the case of a deliberate infringer who has not received written notice, a case unlikely to occur often where a network proposes to broadcast a valuable copyrighted work. As pointed out above, if an infringer has been notified properly, the court needs no compulsory multiple-infringement rule, since it is not bound by the $5,000 maximum in fixing a damage award with sufficient deterrent force. The only remaining situation involves an infringer who has acted innocently—without knowledge or reason to know he has infringed a copyright. Here plaintiff's argument based on deterrence yields an utterly anomolous result. A multiple-minimum damage rule could not possibly deter the infringer who has no reason to know he is violating another's copyright. But such a rule would leave the court no choice but to assess arbitrary and potentially enormous minimum damages against such a nonculpable defendant. Any discretion remaining in the court to fix a "just" award could only be characterized as emasculated.

Plaintiff also argues that a simultaneous telecast is similar to the unauthorized showing of plaintiff's play in 162 theaters, in which event plaintiff could sue each theater separately and recover at least the minimum of $250 from each. Some similarities doubtless exist, as do some differences. Thus, stage performances in 162 theaters would not normally be simultaneous or occur as part of the same business transaction. The cases analyzed above [41] indicate that these may be crucial dissimilarities. In other words, the analogy begs the question since the very issue to be decided is whether multiple performances are, in the words of the Supreme Court in *Westermann* (249 U.S. at 106, 39 S.Ct. at 195), "merely a continuation or repetition of the first." Defendants argue that a more compelling analogy is found in the sale of one day's edition of a newspaper in many cities which, under the authorities, would amount to only one infringement, not many.[42] Moreover, assuming arguendo that plaintiff could indeed recover minimum damages from each broadcasting station individually, that does not imply a fortiori that the network or other defendants named in this suit should be held for this multiplied amount. In many instances of copyright violations there are numerous secondary infringers, whose acts when considered separately may each constitute an infringement, e. g., shops which sell an infringing book. But, to continue with this example, it does not seem that by suing the publisher alone, the copyright holder can collect as minimum statutory damages the amount he might have obtained had he elected to go to the trouble and expense of suing every bookseller who was also an infringer.[43]

▪ The fact of the matter is that the contrasting analogies emphasize but do not solve the problem. On balance, it seems preferable, for the purpose of applying the statutory damage provisions,

41. See notes 21–23 supra.

42. Defendants' Brief in Opposition to and in Mitigation of an Award of Damages (hereinafter cited as "Def. Brief in Opposition"), pp. 8–10. Defendants cite for this point *Westermann*, supra; Cory v. Physical Culture Hotel, Inc., 14 F.Supp. 977 (W.D.N.Y.1936), aff'd, 88 F.2d 411 (2d Cir. 1937), and Schellberg v. Empringham, 36 F.2d 991 (S.D.N.Y.1929). Cf. Douglas v. Cunningham, 294 U.S. 207, 55 S.Ct. 365 (1935) (384,000 copies of Sunday edition of the Boston Post sold by many news vendors regarded as one infringement).

43. The discussion in text is by no means meant to imply that plaintiff here could in fact recover $250 minimum damages in each of 162 suits. See Note, Monetary Recovery for Copyright Infringement, 67 Harv.L.Rev. 1044, 1051–1052 (1954). See also Mura v. Columbia Broadcasting System, Inc., Civil No. 60–2787, S.D.N.Y., April 28, 1965.

to regard the simultaneous network telecast here as one infringement by the network and these co-defendants, rather than many. This preserves flexibility, avoids the possibility of a ridiculous and injurious award in other cases and is the result at least suggested by the cases and the statute. It leaves open conceptually perplexing questions, e. g., whether telecasts separated by a few days or longer constitute one infringement,[44] whether recovery from a network of "in lieu of" damages forecloses subsequent recovery from an individual station for its profits from the infringement, to what extent an initial suit against an infringing station (for actual damages or profits, or for "in lieu of" damages) would affect subsequent suits against other stations or the network. However, these need not now be decided; it is hoped that the present legislative concentration on copyright revision will result in an amendment of the statute clearly resolving all problems in this area. In any event, I hold that the simultaneous network telecast over 162 stations in this case constituted only one infringement by these defendants, so that the minimum damages to be applied need not be $40,500, but only $250.

## II

Having held that the network telecast of "Ethan Frome" was only a single infringement, the next issue is whether there is a $5,000 maximum on damages. Section 101(b) sets that limit for one infringement but also states that:

> [T]he limitation as to the amount of recovery [shall not] apply to infringements occurring after the actual notice to a defendant, either by service of process in a suit or other written notice served upon him.

In the former opinion in this case, it was noted that (240 F.Supp. at 617):

> In December 1959 and January 1960, Davis formally notified defendants that if they went ahead with the proposed television performance of "Ethan Frome" based upon the Deutsch screenplay, without the consent of Davis, they would be committing a deliberate copyright infringement.

The basis for this finding was a five-page letter, dated December 23, 1959, and a telegram, dated January 27, 1960, sent by plaintiff's attorneys to defendants. The letter admonished defendants that:

> If the telecast contains any material which was not in the original novel but is in the Davis dramatization, we will presume that this resulted from access to the famed and established dramatization, and will thereby establish that this constitutes a copyright infringement.[45]

The telegram reiterated this warning, stating:

> PLEASE BE ADVISED ON BEHALF OF DONALD DAVIS AND MATHEWS DAVIS, INC. THE COPYRIGHT OWNERS OF THE DRAMATIZATION OF ETHAN FROME AND SUPPLEMENTING OUR LETTER OF DECEMBER 23 (1) THAT THE SCREEN PLAY WRITTEN BY HELEN DEUTSCH BEING ADAPTED FOR THE DUPONT TELECAST IS BASED UPON THE DAVIS PLAY (2) THAT COLUMBIA SUCCESSOR TO WARNERS HAS NO RIGHT TO LICENSE A LIVE TELECAST (3) THE DUPONT SHOW IS BILLED AS A LIVE TELECAST AND ALL OF ITS CONTRACTS WITH THE WRITERS AND PLAYERS AND OTHERS ARE

---

44. It is true that a few of the telecasts in the instant case were not simultaneous. See note 1 supra and accompanying text. However, an assumption arguendo that these were separate infringements with a required minimum damage of $250 for each telecast is not significant because the damage award fixed in Point III infra is much higher than the total of these minimums.

45. Pl. Ex. 18.

FOR A LIVE TELECAST (4) YOUR HAVING HAD WRITTEN NOTICE THE PLAGIARISM OF THE DAVIS DRAMATIZATION WOULD CONSTITUTE A DELIBERATE COPYRIGHT INFRINGEMENT AND THE DAMAGES UNDER THE COPYRIGHT LAW ARE $250 TO $5,000 FOR EACH TELECAST AND THIS BEING A DELIBERATE INFRINGEMENT IS NOT COVERED BY INSURANCE (5) LIKEWISE MRS. TYLER BY HER ACTS HAS EXTENDED THE ORIGINAL EDITH WHARTON DRAMATIZATION CONTRACT TO THE RENEWAL PERIOD AND CANNOT GRANT A LICENSE FOR A LIVE TELEVISION [sic] WITHOUT THE CONSENT OF THE DAVISES.[46]

▆ The issue is whether these warnings were "actual notice to a defendant, either by service of process in a suit or other written notice served upon him." Once again, there is a dearth of authority directly on point. In Advertisers Exchange, Inc. v. Hinkley,[47] plaintiff's copyrighted advertising material was published twenty-nine times in a local newspaper after the expiration of a contract for the use of the material between plaintiff and defendant, "the proprietor of a small grocery store." Plaintiff sought damages of $94,569, based upon the 94,569 published copies of the twenty-nine issues of the newspaper. The trial court characterized this claimed sum as "a ridiculous amount."[48] Similarly outraged, the appellate court regarded the claim as "an attempt * * * to magnify and inflate * * * damages to an unconscionable great sum of money * * *."[49] In affirming the award below of only $312, the court of appeals held alternatively that although a letter gave the infringer notice, the $5,000 limitation applied because "there was no law suit of which he had notice and he was not then 'a defendant' within the contemplation of the statute."[50] Although the court's concern with the possibility of excess damages was understandable, this interpretation of the notice provision of section 101(b) seems unduly restrictive. By specifying that written notice other than service of process will suffice, Congress has quite surely indicated that one need not already have become a defendant for written notice to be effective. No reason has been pointed out why Congress would have intended to shield an infringer who has been given full written notice until after the arbitrary point in time when the copyright owner has been able to draw up and file a complaint against him. See generally, Nimmer, Copyright § 154.2 at 685–86 (1964). I conclude that a letter or telegram may be sufficient written notice to lift the $5,000 maximum set forth in section 101(b), and that such notice was given here.[51]

▆ Defendants make various contentions that the letter and telegram were somehow legally deficient as notice. However, their arguments—including a claim that their freedom of speech is being unconstitutionally violated[52]—are without merit. The violation by defendants in this case was willful in the sense that they knew they were taking a calculated risk. It was not the situation en-

---

**46.** Pl. Ex. 20. Defendants Babbin and Gellen were not personally notified by plaintiff's written communications, but, as indicated in the earlier opinion, they were made aware of plaintiff's claim. 240 F.Supp. 617 n. 21, 620.

**47.** 101 F.Supp. 801, 806 (W.D.Mo.1951), aff'd, 199 F.2d 313 (8th Cir. 1952), cert. denied, 344 U.S. 921, 73 S.Ct. 388, 97 L.Ed. 710 (1953).

**48.** 101 F.Supp. at 805–806.

**49.** 199 F.2d at 316.

**50.** Id. at 315.

**51.** Cf. Universal Pictures Co. v. Harold Lloyd Corp., 162 F.2d 354, 371 (9th Cir. 1947), containing possible dictum that actual notice is sufficient even though there was no written notice at all.

**52.** Def. Brief in Opposition, p. 17.

visioned recently by the Report of the Register of Copyrights where "a television network may receive a notice alleging infringement on the eve of a scheduled broadcast when it is too late to defer the program pending an investigation of the claim." [53] Plaintiff's letter was mailed over seven weeks before the telecast, and his telegram was sent over three weeks before. Moreover, they were both preceded by abortive negotiations between plaintiff and Susskind.[54] The day before the telecast, DuPont wrote plaintiff's attorneys to say that, on the basis of an investigation it had directed BBDO to make following plaintiff's telegram, DuPont had concluded that no infringement was involved.[55] Clearly, then, defendants had sufficient time to act on the notice they received.

Having found that each defendant, except Babbin and Gellen, received timely and sufficient written notice, CBS, DuPont, Talent, Susskind, and BBDO may be held jointly and severally liable for damages in excess of $5,000. Babbin and Gellen may be held liable only to the extent of $5,000.

### III

Thus, the ultimate issue before the court is what damages "appear to be just." On the facts of this case, the possible range of discretion is broad, since the $250 minimum for one infringement (see Point I, supra) is too small, and the $5,000 maximum does not apply (see Point II, supra). With these two limits inapplicable, as might be expected, the suggestions of the parties are far apart.

Plaintiff urges that damages be fixed at $211,500 [56] based upon the following computation: $30,000 as a figure "reasonably reflecting damages" to plaintiff, added to $40,500, as a figure "reasonably reflecting profits," and in lieu thereof a minimum of $250 multiplied by 162 separate infringements to make a total of $70,500 which, in turn, should be tripled "as a deterrent." [57] Defendants suggest, as indicated in Point II supra, that the $5,000 limit for one infringement applies. However, in the event this contention is rejected, as it has been, defendants alternatively argue that "just" damages should be determined by the yardstick amounts of $100 for the first performance and $50 for each additional performance,[58] for a total of $8,150.

Plaintiff's contention that a minimum of $40,500 must be included in the damage figure because there were 162 separate infringements has already been dealt with in Point I supra, and rejected. Moreover, short shrift should be made of his argument that whatever figure is fixed as damages should be trebled to serve as "a deterrent." Plaintiff relies by analogy on patent and antitrust law in arguing that Congress has there determined "what formula would constitute a deterrent." [59] However, the trebling of damages there is done pursuant to specific congressional authorization or command,[60] notably absent here. Plaintiff cites no judicial precedent for the proposition that the court has such authority. Moreover, even if by some stretch of the imagination trebling, as proposed by plaintiff, were within the court's authority, I emphatically reject the notion that the suggested astronomical figure would on these facts be "just."

---

53. Register's Report at 105; see Study No. 23 at 78 (1958).

54. Pl. Ex. 18, p. 1.

55. Pl. Ex. 23.

56. Plaintiff's Brief in Support of an Award for Damages (hereinafter cited as "Pl. Brief in Support"), p. 24.

57. Ibid. In Plaintiff's Reply Brief, p. 17, he asks for similar sums based on damages of $1,000 to $1,500 per network sta-

tion or one penny for each of the 17 million estimated viewers of the telecast.

58. See statutory language quoted at p. 332 supra.

59. Pl. Brief in Support, p. 24.

60. 35 U.S.C. § 284; 15 U.S.C. § 15. Plaintiff also cites 17 U.S.C. § 1(e), which allows trebled royalties of 6 cents per mechanical reproduction of a musical composition under certain circumstances. Plaintiff's Reply Brief, p. 5.

Having rejected plaintiff's extreme position, it must still be determined what "just" damages are. The first question is whether the yardstick amounts must be followed once the $5,000 maximum is exceeded. Defendants refer to the yardstick amount of $50 a performance but have not argued that the court must follow the yardstick and find damages of $8,150. In fact, defendants alternatively suggest that the court look to "the infringed work's true market value for the use made," [61] although by a process of apportionment and argument defendants by this route reach a value of less than $5,000. The cases abound with statements that the yardstick amounts are discretionary and need not be followed by the courts.[62] However, these have generally been made in the context of an award where the statutory minimum of $250 and maximum of $5,000 both applied. Thus, in Douglas v. Cunningham, 294 U.S. 207, 55 S.Ct. 365 (1935), the issue was whether the trial court had erred in awarding $5,000 for the publication in some 384,000 copies of a Sunday edition of the Boston Post of an article infringing plaintiffs' copyrighted story. In holding the award proper, the Court said (294 U.S. at 210, 55 S.Ct. at 366):

> The trial judge may allow such damages as he deems to be just and may, in the case of an infringement such as is here shown, in his discretion, use as the measure of damages one dollar for each copy,—Congress declaring, however, that just damages, even for the circulation of a single copy, cannot be less than $250, and no matter how many copies are made, cannot be more than $5000. In the *Westermann* and *LaSalle* cases it was held that not less than $250

could be awarded for a single publication or performance. It follows that such an award, in the contemplation of the statute, is just. The question now presented is whether it can be unjust, according to the legislative standard, to use the prescribed measure,—$1 per copy,—up to the maximum permitted by the section. As the *Westermann* Case shows, the law commits to the trier of facts, within the named limits, discretion to apply the measure furnished by the statute provided he awards no more than $5,000. He need not award $1 for each copy, but, if upon consideration of the circumstances he determines that he should do so, his action can not be said to be unjust. In other words, the employment of the statutory yardstick, *within set limits*, is committed solely to the court which hears the case, and this fact takes the matter out of the ordinary rule with respect to abuse of discretion. This construction is required by the language and the purpose of the statute. (Emphasis added.)

Thus, it seems clear that use of the yardstick amounts up to and including $5,000 is discretionary. However, whether they can be disregarded when the $5,000 limit is inapplicable poses more difficulty. The case law is again scanty. Two courts refused to follow the yardstick amounts because the damage so computed was too high even though the violation occurred after notice. In Sebring Pottery Co. v. Steubenville Pottery Co., 9 F.Supp. 384 (N.D.Ohio 1934), the yardstick damages (at one dollar a copy) for violating plaintiff's copyright in an advertising card or circular would have been over $39,000. The court approved a master's recommendation that statutory

---

61. Def. Brief in Opposition, p. 28.

62. E. g., Advertisers Exchange, Inc. v. Hinkley, 199 F.2d 313, 316 (8th Cir. 1952), cert. denied, 344 U.S. 921, 73 S. Ct. 388 (1953); Hartfield v. Peterson, 91 F.2d 998, 1001 (2d Cir. 1937);

Russell & Stoll Co. v. Oceanic Elec. Supply Co., 80 F.2d 864 (2d Cir. 1936) (dictum); see Nikanov v. Simon & Schuster, Inc., 144 F.Supp. 375, 380 (S.D. N.Y.1956), aff'd, 246 F.2d 501 (2d Cir. 1957).

damages be fixed at $2,500, the amount at which plaintiff had offered to settle the case before an accounting had been ordered. In Turner & Dahnken v. Crowley, 252 F. 749 (9th Cir. 1918), defendant, with notice, had distributed 7,000 copies of plaintiff's copyrighted song and had been held liable for $7,000 in damages at one dollar per copy, the yardstick amount. The appellate court reduced the damage award to $560, a figure it characterized as "a fair estimate" of plaintiff's damage,[63] although plaintiff had offered no proof of actual loss or of profits. In Schellberg v. Empringham, 36 F.2d 991 (S.D.N.Y.1929), the court allowed statutory damages of $8,000 for 8,000 copies of an infringing book, at the yardstick amount of one dollar per copy. It is not clear whether the basis for awarding over $5,000 was statutory notice or an assumption that the two editions of the offending book constituted two infringements so that the maximum damage limit was $10,000. Research discloses no case where the statutory damage award for one infringement was over $5,000 and exceeded the yardstick amount.[64]

All of this leaves the matter unsettled. The Supreme Court's reference to "within set limits" in Douglas v. Cunningham, supra, may indicate discretion to ignore the yardstick amounts only when damages are fixed at or under $5,000. On the other hand, if the yardstick amounts may be disregarded to reach lesser damages, logically they may be disregarded to fix higher damages. The statutory language, after all, directs the court to award "such damages as to the court shall appear to be just." The nub of the difficulty is that once the $5,000 maximum is disregarded because of notice, the court is on an uncharted sea, unless it adheres to the yardstick amounts. By hypothesis, there is in this situation no proof—or inadequate proof—of plaintiff's damages or defendants' profits.

The yardstick amounts at least then provide something definite to turn to. But, it should be noted that one of the reasons given above for construing a network telecast as only one infringement was to give a court flexibility rather than bind it to an unrealistic massing of $250 minimums.[65] Requiring rigid adherence in every case to yardstick amounts fixed in 1909 is inconsistent with this approach; it can hardly be justified when dealing with radio or television performances reaching a far larger audience than then envisioned. Although, as just suggested, the Supreme Court may have meant to imply in Douglas v. Cunningham that a trial court has no discretion to depart from the yardstick amounts above $5,000, its discussion is certainly subject to a contrary interpretation, one supporting the view taken here. The Court stated that "the employment of the statutory yardstick, within set limits, is committed solely to the court which hears the case, and this fact takes the matter out of the ordinary rule with respect to abuse of discretion." Rather than implying that a trial court has no authority to exceed the yardstick amounts over $5,000, the Court may simply have meant that if a trial court did go higher, its award would be subject to "the ordinary rule with respect to abuse of discretion." This interpretation seems sound; it enables the trial court to assess fair statutory damages in such a case as this, while protecting the infringer against unreasonable awards by substituting for the statutory yardstick closer appellate review.

After much reflection, I conclude that a court has the discretion to depart from the yardstick amounts, even if the $5,000 limit is inapplicable, and can depart upward as well as downward. This upward discretion should be used most sparingly and only when the yardstick amounts produce a clearly inadequate damage award for a violation of plain-

63. 252 F. at 754.

64. Cf. Nikanov v. Simon & Schuster, Inc., 144 F.Supp. 375, 380 (S.D.N.Y.1956), aff'd, 246 F.2d 501 (2d Cir. 1957) (damages of $5,000, higher than yardstick amount, awarded).

65. See p. 341 supra.

tiff's copyright. I have no doubt that this is such a case.

▆▆▆▆▆ The question of what to look to here in fixing damages still remains. In awarding statutory damages under the $5,000 maximum for the infringement of a photograph by the printing of 16,000 copies, Judge Learned Hand stated:

> Under section 25b(2), Comp.St.1913, § 9546 [now section 101(b)], these numbers [16,000 copies] would exceed the maximum, but I shall not take them as a basis of damages in any event, as I cannot think it has any relation to actual damages. I shall rather try to estimate Gross' actual damages, without observing the rules of evidence, as though the issue had to be proved like other such issues, *and allowing myself considerable latitude in speculation.* This is, as I understand the duty laid upon the court by section 25b: In place of the old penalties the court is to estimate damages, but to estimate them within the sums given, without the limitations of usual legal proof. I think the whole course of copyright law shows a recognition of the difficulty of making legal proof of damages, and that, in substituting for rigid penalties the discretionary power of the court, we must assume that a plaintiff should not fail for lack of proof. *I must assess the damages, all things considered, by the best inference I can make, even when I cannot have much basis for certainty, even when the plaintiff would fail, were the issue tried before a jury.*[66] (Emphasis added.)

Some of the facts already in this record or logically inferable are as follows: In 1959, defendant Talent paid $15,000 to the heirs of Edith Wharton for a license to use the original story.[67] In 1942, Warner Brothers paid $17,500 for the motion picture rights,[68] although no motion picture was ever subsequently made. The Davis play, excluding the Broadway production of about thirty years ago, has not been in demand or a financially successful work.[69] In 1959, plaintiff may possibly have been willing to pay $30,000 for the re-purchase from Columbia Pictures of the motion picture rights, but the highest offer he ever actually made was $10,000.[70] Plaintiff himself suggests that "the sum of $30,000 might reasonably reflect the price plaintiff could expect to receive for a one-shot live television performance of his play." [71] Defendants "speculate that the unapportioned market value of the Davis play for a single network broadcast lies somewhere in an area less than a figure between $17,500 and $10,000." [72] However, both plaintiff and defendants then veer off sharply from this middle area of $30,000 to $10,000–$17,500. Plaintiff urges that since he had larger plans for his dramatization in the motion picture field, the value of the play destroyed by the telecast was far in excess of $30,000. But the plans were nebulous, at least on this record. Plaintiff also suggests use of a measure of "a profit of a single penny for each of the 17,000,000 viewers of the infringing telecast," or $1,000 to $1,500 per station as the worth to defendant advertisers.[73] However, these possibilities are too fanciful even "allowing myself considerable latitude in speculation." See Gross v. Van Dyk Gravure Co., as quoted, supra. Conversely, defendants argue that the Davis play's "true market value," whatever it may be, should be halved, citing Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940); Orgel v. Clark Boardman Co., 301 F.2d 119 (2d

66. As quoted in Gross v. Van Dyk Gravure Co., 230 Fed. 412, 413 (2d Cir. 1916), affirming Judge Hand.

67. Defendants' Exhibit (hereinafter cited as "Def. Ex.") A.

68. Pl. Ex. 15.

69. See Stipulation, pp. 18–21.

70. Id. at 18–20.

71. Pl. Brief in Support, p. 16.

72. Def. Brief in Opposition, p. 33.

73. Plaintiff's Reply Brief, p. 17.

Cir.), cert. denied, 371 U.S. 817, 83 S.Ct. 31, 9 L.Ed.2d 58 (1962), and Alfred Bell & Co. v. Catalda Fine Arts, Inc., 86 F. Supp. 399 (S.D.N.Y.1949), aff'd, 191 F. 2d 99 (2d Cir. 1951). Those cases all dealt with the question of whether a copyright infringer's profits should not be apportioned "so as to give to the owner of the copyright only that part of the profits found to be attributable to the use of the copyrighted material as distinguished from what the infringer himself has supplied * * *." See *Sheldon*, 309 U.S. at 396, 60 S.Ct. at 682. Since those decisions all involved proof of an infringer's actual profits, they are not applicable here where it is impossible to prove, or a fortiori apportion, defendants' profits.[74] Defendants' final argument that plaintiff would be "unjustly enriched" unless any "just" award is reduced by half is similarly without merit.[75]

Accordingly, after a review of the entire record, I find that the damages which "to the court appear to be just" under the circumstances of this case amount to $25,000. In reaching this conclusion I have taken into account plaintiff's undoubted injury, plaintiff's notice to defendants prior to infringement, and all of the other facts and arguments advanced by the parties. Defendants have objected to the admission of certain evidence, which I have admitted for the purpose offered, but these objections are not significant; my finding would be the same whether the evidence is in the record or not.

To summarize: I find that the network telecast over 162 stations was one infringement by these defendants, that the $5,000 maximum does not apply, and that plaintiff is entitled to an award of damages of $25,000. The foregoing constitutes the court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a). A decree, in accordance with these findings, may be settled on notice.

---

74. Stipulation, p. 1.

75. Def. Brief in Opposition, p. 32.