**ROY EXPORT COMPANY ESTABLISHMENT OF VADUZ, LIECHTENSTEIN, BLACK INC., A. G., Filmverhuurkantoor De Dam B. V., and rbc Films, Plaintiffs,**

v.

**COLUMBIA BROADCASTING SYSTEM INC., Defendant.**

No. 78–Civ. 2417.

United States District Court, S. D. New York.

Dec. 17, 1980.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs; Stuart Robinowitz, Steven B. Rosenfeld, Mary B. Seyferth, New York City, of counsel.

Coudert Brothers, New York City, for defendant; Carleton G. Eldridge, Jr., John M. Keene, III, June A. Eichbaum, New York City, of counsel.

LASKER, District Judge.

Columbia Broadcasting System, Inc. ("CBS") moves for a judgment notwithstanding the verdict, or, in the alternative, for a new trial, pursuant to Rule 50(b), Fed.R.Civ.Pr., following a three week trial in which the jury found that CBS had infringed plaintiffs' statutory and common law copyrights and had unfairly competed with plaintiffs.[1] CBS maintains that its motions for directed verdict and dismissal should have been granted because (1) its use of the copyrighted works was protected as a matter of law by the fair use doctrine or the First Amendment to the Constitution; (2) plaintiffs had no common law copyright interest in any work in issue; (3) the common law unfair competition claim was federally preempted by the copyright statutes in this case; and (4) its use of two of the copyrighted works was authorized as a matter of law. CBS also claims that punitive damages were unwarranted in this action or were excessive and duplicative and that errors in the jury charge and in the admission of evidence require a new trial.[2]

In a motion under Rule 50(b), the evidence is to be viewed in the light most favorable to the plaintiffs, and plaintiffs are entitled to the benefit of all inferences which the evidence fairly supports. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962). If there was sufficient evidence to present a jury question on a particular claim, then the denial of a motion for directed verdict on that claim was proper and the motion for judgment notwithstanding the verdict must be denied. *Gehrhardt v. General Motors Corp.*, 581 F.2d 7 (2d Cir. 1978); *Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 742 (2d Cir. 1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976).

## I. BACKGROUND

The works at issue in this case are Charlie Chaplin films and derivative works. The plaintiffs own the copyrights in, and various distribution rights to, the six motion pictures relevant to this case.[3] (PTO ¶¶ 5, 6). Each film was written, produced, directed by and starred Charlie Chaplin.

Between 1956 and 1971, Roy Export acquired from Chaplin and his corporation the sole and exclusive ownership of the copyrights in the Chaplin films. (PTO ¶ 7). Black, Inc. owns the sole and exclusive worldwide distribution rights until 1986. (PTO ¶ 8). De Dam acquired from Black, Inc. the exclusive United States television rights to the films until 1986 and the exclu-

---

1. The jury awarded plaintiffs $7,280. in damages for statutory copyright infringement, $1. in compensatory and $300,000. in punitive damages on the common law copyright infringement and $300,000. in compensatory and $110,000. in punitive damages on the unfair competition claim.

2. Judge Ward, who presided at trial, is not hearing this motion because he became disqualified pursuant to the provisions of 28 U.S.C. § 455 following trial. Had we been the trial court in this case, our familiarity with the unusually complex factual and legal issues in this case might have enabled us to dispose of this motion in brief fashion.

3. The films are "The Kid," "The Gold Rush," "The Circus," "City Lights," "Modern Times," and "The Great Dictator." ("The Chaplin films").

sive United States theatrical rights. (PTO ¶ 9). rbc Films has held licenses for United States non-theatrical distribution rights for the Chaplin films since 1973 and, since 1975 has held exclusive licenses for United States non-theatrical distribution rights for "The Gentleman Tramp." (PTO ¶ 10). Bert Schneider and Mo Rothman had at all relevant times authority to act on behalf of Black, Inc. and De Dam in authorizing use of the Chaplin films. (PTO ¶ 1(d)).

In 1972, the Academy of Motion Picture Arts and Sciences ("AMPAS") approached Schneider with the possibility of persuading Chaplin to return to the United States for the first time in twenty years to receive a special award from AMPAS during the 1972 nationally televised Academy Awards presentation. In connection with Chaplin's appearance on the Academy Awards show, AMPAS requested that Schneider supervise the preparation of a tribute to Chaplin consisting of highlights from the Chaplin films. Schneider enlisted the aid of the noted director, Peter Bogdanovitch, who in turn recommended that Richard Pattersen be used for film editing. They selected particular scenes, planned the particular sequence and timing, and produced a 13 minute film consisting of highlights from the Chaplin films. After showing it to Chaplin, a scene was added. This film (the "Compilation") was then played on the 1972 Academy Awards telecast. (Tr. 238–241). As Schneider testified, the understanding with AMPAS was that the Compilation was to be used on the Academy Awards broadcast only, and that AMPAS had no right to use it again. (Tr. 238–241). The Compilation is the subject of plaintiffs' common law copyright infringement claim.

In 1974, by virtue of various agreements entered into between plaintiffs and others, plaintiffs agreed to produce a film biography of Chaplin. Schneider acted as producer of this film, which was completed in 1975 and entitled "The Gentleman Tramp." Many of the same highlights of Chaplin's films which had been included in the Compilation were included in "The Gentleman Tramp," Roy Export having authorized their use. (PTO ¶ 30). Two versions of

"The Gentleman Tramp" were prepared, one designed for American television as a 90 minute special, the other for foreign theatrical exhibition. Roy Export owns the copyrights to "The Gentleman Tramp." (PTO ¶¶ 31–35).

In 1973, CBS had begun work on its own retrospective program about Chaplin for use at the time of Chaplin's death. CBS soon learned of plaintiffs' copyrights on the Chaplin films and plaintiffs' plans to produce their own retrospective biography ("The Gentleman Tramp"). CBS repeatedly requested permission to use excerpts from the Chaplin films, but plaintiffs refused, explaining that they themselves were producing the "definitive" Chaplin biography. (Pl. Ex. 15, 16, 18, 23–26, 36, 38, 40, 42). Nevertheless, CBS prepared a "rough cut" which included two scenes from copyrighted films which CBS had obtained in 1972 for use on its "60 Minutes" program.

In 1976, rbc Films sent CBS a print of "The Gentleman Tramp" in an attempt to sell CBS a license for the film. CBS screened the film but did not purchase the license. In December, 1977, rbc made another unsuccessful attempt to sell the license for "The Gentleman Tramp" to CBS.

On December 25, 1977, Charlie Chaplin died. Russell Bensley, director of the CBS Special Events Unit, attempted to contact Schneider and Rothman to see if they had changed their minds and would grant CBS permission to use excerpts. The same day, CBS obtained from NBC a copy of the Compilation which had been shown on the Academy Awards broadcast. Although CBS was unable to reach Schneider or Rothman, it decided to proceed with a retrospective. At that time, CBS had two possible versions available for broadcast, one the "rough cut" consisting primarily of public domain footage, the other a new version which incorporated, with minor editions, the Compilation as well as other copyrighted material. (Tr. 661, 675–76). Richard Salant, the President of CBS News, made the final decision to use the latter version, 40% of which consisted of plain-

tiffs' copyrighted films. That show was broadcast on December 26, 1977, between 11:30 P.M. and Midnight (EST). (PTO ¶¶ 60, 64; Tr. 683–692).

The CBS broadcast has given rise to this suit. The jury concluded that CBS' use of the Chaplin films (consisting of CBS' use of the eleven scenes contained in the Compilation, and two other copyrighted excerpts) constituted an infringement of plaintiffs statutory copyright in the films themselves, CBS' use of the Compilation constituted an infringement of plaintiffs' common law copyright, and CBS' conduct constituted unfair competition with plaintiffs' Chaplin retrospective, "The Gentleman Tramp."

## II. THE FAIR USE DEFENSE

CBS asserts that its motions to dismiss and for a directed verdict with respect to the statutory copyright infringement claim should have been granted because its use of excerpts from the Chaplin films constituted fair use as a matter of law. As we understand its position, CBS does not dispute that the applicability of the fair use defense is ordinarily a factual question for the jury to determine. *Meeropol v. Nizer*, 560 F.2d 1061, 1071 (2d Cir. 1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978). Rather, CBS contends that the facts pertinent to the fair use defense were not seriously in dispute. (Defendant's Brief, pp. 15–16).

 The doctrine of fair use creates a "privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner..." *Rosemont Enterprises, Inc. v. Random House, Inc.*, 336 F.2d 303, 306 (2d Cir. 1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967), *quoting* Ball, *The Law of Copyright and Literary Property*, 260 (1944). The doctrine is meant to balance the public's interest in the dissemination of information with the exclu-

sive rights of the copyright holder. *Wainwright Securities, Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1977). Four factors have traditionally been considered in determining the applicability of the Fair Use defense: [4] (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. *Iowa State University Research Foundation, Inc. v. American Broadcasting Companies, Inc.*, 621 F.2d 57 (2d Cir. 1980).

### A. The Purpose and Character of CBS' Use of Plaintiffs' Copyrighted Material

 CBS maintains that only the fourth factor—the effect of the use upon the potential market for or value of the copyrighted work—was seriously in dispute in this case. It claims that the first factor—the purpose and character of the use—clearly runs in its ,favor, since its special constituted news reporting of a matter of intense public interest, the death of Charlie Chaplin. According to CBS, its use of the Chaplin films was essential to acquaint the public with the artistic genius of the controversial Chaplin. Due to Chaplin's twenty year absence and his withholding of his later films from the American market, CBS argues, it could not properly communicate the significance of his life without showing these excerpts. Moreover, the fact that Chaplin had been forced out of the country during the 1950's wave of McCartheyism and the political nature of his life and work made Chaplin's "oeuvre" especially newsworthy at his death. Thus, CBS contends, the public benefit gained from the encouragement of historical and biographical works, *see Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d

---

4. While originating as a judge-made doctrine, the fair use defense, along with these four factors, have now been codified in 17 U.S.C. § 107 of the 1976 Copyright Act. The new statute,

however, does not govern this case because plaintiffs' statutory copyrights were secured before the 1976 Act took effect.

Cir. 1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967), outweighed the copyright owner's interest in this case. CBS maintains that just as Howard Hughes' attempt to prevent a biographer from publishing copyrighted material about his life was rejected in *Rosemont*, so plaintiffs' attempt to monopolize the subject matter of their copyrights should be rejected here insofar as it has the effect of depriving the public of information about Chaplin's life.

CBS' contentions are unpersuasive. Unlike Howard Hughes' attempt in *Rosemont* to prevent unauthorized use of *facts* about his life, plaintiffs here seek to protect the *artistic expressions* of Charlie Chaplin. There is no doubt that CBS "possessed an unfettered right to use any factual information" about Chaplin. *Iowa State, supra* at 61. CBS instead used Chaplin's artistic works themselves. "The public interest in the free flow of information is assured by the law's refusal to recognize a valid copyright in facts.... The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance." (citations omitted) *Iowa State, supra* at 61.

Moreover, although the public interest in Chaplin at the time of his death may make the fair use defense relevant, the success of the defense depends on a determination that the actual use was fair and reasonable in the circumstances. Here the evidence established that CBS had prepared an alternative version of its special which largely used films in the public domain rather than plaintiffs' copyrighted films. The jury could reasonably have concluded that if, as CBS strenuously argued, it was essential to proper coverage of Chaplin's death that some film clips be shown, the showing of excerpts from films in the public domain would have been sufficient, and that CBS' decision to broadcast the offending version was motivated by commercial rather than educational considerations. Nor does CBS' emphasis on the unsponsored nature of the show establish that CBS did not use the films for commercial exploitation, since common experience suggests that CBS stood to gain at least indirect commercial benefit from the ratings boost which it had reason to hope would (and in fact did) result from the special. (PTO ¶¶ 66–69, 73–74). While this fact "does not, standing alone, deprive [CBS] of the fair use defense ... it is relevant." *Meeropol v. Nizer*, 560 F.2d 1061, 1069 (2d Cir. 1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978).

Finally, CBS argues that, somewhat like the Zapruder film of President Kennedy's assassination at issue in *Time, Inc. v. Bernard Geis Associates*, 293 F.Supp. 130 (S.D. N.Y.1968), Chaplin's artistic expressions were newsworthy in themselves. But this argument misconceives the policies of the copyright laws. Under CBS' view, the more successful an artist is, the less he can protect or demand payment for the use of his work. Yet the copyright law bestows a monopoly right on the copyright owner to encourage artistic creativity, and would be undermined by CBS' bootstrapping argument. Nor do the political circumstances surrounding Chaplin's exclusion from the United States justify CBS' use of Chaplin's films. It would be a cruel irony if the fact that Chaplin was wrongly banned from this country were used to justify unauthorized and uncompensated use of his artistic products upon his return. Thus, despite CBS' strenuous arguments to the contrary, there is no doubt that a jury member could reasonably conclude that the purpose and character of CBS' use tended to negate rather than support a fair use defense.

### B. The Nature of Plaintiffs' Copyrighted Work

CBS also argues that the nature of the plaintiffs' copyrighted work supports its fair use defense. It contends that because the Chaplin films in question were only sporadically shown in American theatres between 1972 and 1977, plaintiffs' copyrighted work was not of a commercial nature. (Defendant's Brief, p. 14). However, the claim misses the point. Despite the quantum of commercial exploitation made

of the films at the time of CBS' actions, the crucial consideration is that the six Chaplin films were created for commercial gain. The jury could have reasonably concluded that CBS used the films to "fulfill the same function—[and therefore the] scope of fair use is constricted." 3 *Nimmer on Copyright* § 13.05[B], p. 13–58.

### C. The Substantiality of CBS' Use of Plaintiffs' Copyrighted Works

CBS next argues that its use of the Chaplin films was not substantial since only a short excerpt from each film was broadcast. One minute and forty-five seconds was used from "City Lights," which has a one hour and twenty minute running time; three minutes and forty-five seconds of the one hour film "The Kid" was used; CBS used one minute and twenty-five seconds of "The Circus," with a total running time of one hour and twelve minutes; fifty-five seconds from the one hour and twenty-nine minute film "Modern Times"; and one minute and fifteen seconds was used out of a possible one hour and twelve minutes from "The Gold Rush."

We find that the jury could reasonably have found, at least with respect to some of the films, that CBS' use was quantitatively substantial. And even assuming that CBS' use of some of the films was quantitatively small, the jury could reasonably have concluded that it was qualitatively great. CBS concedes that each of the scenes it used was amongst Chaplin's best (Defendant's Brief, p. 13) and there was evidence that each such excerpt was central to the film in which it appeared. (Tr. 1590–1601, 1618). Indeed, CBS itself at trial apparently maintained that the substantiality of its use must be determined from a qualitative as well as quantitative point of view. (Tr. at 774). CBS' present attempt to argue that its use of Chaplin's best scenes was justified by its need to show the full extent of Chaplin's genius thus must be rejected. At best, the fact that CBS used Chaplin's best scenes runs against, not for, a finding of fair use establishing, as it does, the qualita-

tive substantiality of the use. As the trial judge [4A] put it at trial, "I would think there would be a substantial taking of 'Gone With the Wind' if somebody just took the burning of Atlanta . . . ten or fifteen minutes of a three or four hour movie." (Tr. at 774). In any event, the question of whether CBS' use was substantial presented a classic jury question; the trial court properly submitted it to them.

### D. The Effect of CBS' Use on the Potential Market For or Value of the Plaintiffs' Copyrighted Works

CBS agrees that the fourth factor—the effect of the use upon the potential market for or value of the copyrighted works—was in dispute. It argues, however, that there was absolutely no evidence that its broadcast had any effect on the potential market for the Chaplin films and that the trial court incorrectly allowed the jury to consider evidence of harm to the potential market for "The Gentleman Tramp" in determining the applicability of the fair use defense. As noted above, "The Gentleman Tramp" is a film biography of Chaplin prepared by plaintiffs with authorization to use excerpts from the copyrighted films, i. e., it is a derivative work. There is no allegation in the complaint that CBS infringed the copyright of "The Gentleman Tramp." The trial court instructed the jury that "you should consider the effect of [CBS'] use upon the value of any of the plaintiffs' rights in the copyrighted work, including the value of the derivative work, 'The Gentleman Tramp' . . . ." (Tr. 1813). CBS maintains that the standard of "the effect upon . . . the copyrighted work" applies only to the allegedly infringed work itself (the Chaplin films), not to the derivative work ("The Gentleman Tramp").

CBS' distinction between the effect of an infringement of an original copyrighted work on the inchoate right to make a derivative work as opposed to the effect on the derivative work itself is without merit. Plaintiffs correctly indicate the incongruous

---

**4A.** *See* footnote 2, *supra.*

results which such a distinction would produce. If CBS' theory were the law, once a copyright owner had sold the right to make a derivative work and that right was exercised, a party could infringe the original work in order to compete with the derivative work and neither the owner of the copyright of the original work nor the owner of the copyright of the derivative work would have a remedy. The owner of the derivative copyright could not complain because the derivative work itself would not have been infringed; and the owner of the original copyright would face a fair use defense because, under CBS' theory, effect on the potential market for or the value of the derivative work may not be considered.

In addition, we believe that at least indirect harm to the potential market for the original work may logically flow from the inability to protect the derivative work. The value of the right to use the copyrighted work to make a derivative work, which the copyright owner may sell or himself exercise, would certainly seem to be diminished by the ability of another to use the copyrighted work in order to compete at will with the derivative work. In the instant case, the copyright owner of the Chaplin films gave his authorization for excerpts to be used in "The Gentleman Tramp." He did not authorize use for the CBS show. If CBS may nevertheless use the films because its unauthorized use harmed only "The Gentleman Tramp" (the derivative) and not the potential market for the original films themselves, the value of the copyright owner's authorization would be severely diminished. It is thus apparent that the concept of "effect upon . . . the

copyrighted work" must apply not only to the original copyrighted work, but also the derivative work. In *Marvin Worth Productions v. Superior Films Corp.*, 319 F.Supp. 1269 (S.D.N.Y.1970), we considered harm to a derivative work in production relevant to the applicability of a fair use defense. The fact that the derivative work in the present case had been completely produced and had itself been copyrighted is a distinction without a difference. The same policies apply; the ultimate value of the original copyrighted work is affected in both instances.[5]

\* \* \* \* \* \*

In addition to the four factors discussed above, there was ample evidence from which a jury could reasonably find that CBS' use of the copyrighted material was in bad faith. "Fair use presupposes 'good faith and fair dealing.'" *Time, Inc. v. Bernard Geis Associates*, 293 F.Supp. 130 (1968), *quoting* Schulman, Fair Use and the Revision of the Copyright Act, 53 Iowa L.Rev. 832 (1968); *Iowa State, supra* at 62. The facts are that CBS repeatedly requested plaintiffs' permission to use excerpts of the copyrighted films during the period from 1973 through 1977. Plaintiffs denied each request, making it perfectly clear that they would not grant permission because plaintiffs were themselves using the films to make their own Chaplin retrospective. (Pl. Ex. 15, 16, 18, 23–26, 36–38, 40, 42). Moreover, CBS acquired the Compilation from NBC based on the misrepresentation that it would use excerpts only on the nightly news. (Tr. 1322–23, 1327–28). And CBS' conduct violated not only its own guidelines but also industry standards of

---

**5.** CBS relies on *New York Times Company v. Roxbury Data Interface, Inc.*, 434 F.Supp. 217 (D.N.J.1977) for the proposition that evidence of harm to the potential market for the derivative work is not relevant to the question of fair use of the infringed copyrighted work. Plaintiff asserts that *Roxbury* is not on point because there the claimed harm was to non-derivative works which merely shared a common source. In *Roxbury, The New York Times* owned copyrights to a general index to the newspaper which defendants had used in compiling a special proper name index. The *Times* claimed that defendant's index harmed the po-

tential market for their computer data bank and their other cumulative indexes, particularly the Obituaries Index. It is unclear whether the court in *Roxbury* considered the computer data bank and the other indexes to be derivative or not; we find nothing in the case to support plaintiff's assertion that the works were not derivative. Be that as it may, if the *Roxbury* court did consider harm to the potential market of derivative work to be irrelevant to a determination of the availability of the fair use defense, *see* 434 F.Supp. at 224, we disagree for the reasons stated in the text.

ethical behavior. (Pl. Ex. 77, 83–85, 87–91; Tr. 301, 417–22, 962–66, 1197–98, 1298–1302, 1604–05). Finally, the dramatic ratings boost which CBS in fact enjoyed from the Chaplin special leads to an inference that CBS ignored plaintiffs' rights for its own commercial gain and prestige. As the trial court stated, "there was knowing, willful conduct spelled out as clear as I have ever seen it spelled out. . ." (Tr. 790–91).

In sum, there was sufficient evidence for the jury reasonably to decide that each relevant factor went against CBS' claim of a fair use defense. In the circumstances, it would have been error for the trial judge to grant CBS' motions for a directed verdict or dismissal as to the statutory copyrighted infringement claims. *Meeropol v. Nizer, supra,* at 1071.[6]

\* \* \* \* \* \*

■ CBS also argues that its use of the Compilation was fair as a matter of law. It maintains that Chaplin's 1972 return to the United States to appear before a nation-wide television audience was a major news event, that the showing of the Compilation was an irreducible part of that event, and that the Academy Awards show itself was an audiovisual news event which could not be appreciated in any other way than by broadcasting it. Again CBS turns the copyright law on its head by contending that significant artistic achievement becomes an event in itself so that the artistic product can be used without authorization or compensation to the copyright owners. The claim rings hollow. Clearly, it was the fact of *Chaplin's* appearance and not the artistic works which were presented with it which was arguably newsworthy five years later, upon his death. CBS' taking of virtually the entire Compilation cannot be justified by labeling it as part of a newsworthy event.

## III. THE FIRST AMENDMENT DEFENSE

■ Apart from its fair use argument, CBS contends that its broadcast of the Chaplin films and the Compilation constituted protected expression under the First Amendment. CBS relies on Nimmer's comment that some copyrighted works, such as photographs of the My Lai massacre in Vietnam,

> "make a unique contribution to an enlightened democratic dialogue. No amount of words describing the 'idea' of the massacre could substitute for the public insight gained through the photographs. The photographic expression, not merely the idea, became essential . . . to fully understand . . . that tragic episode . . ." 1 *Nimmer on Copyright* § 1.10[c], p. 1–82.

Thus, Nimmer suggests that with respect to certain news photographs, the interest of a copyright owner is outweighed by a First Amendment interest in the subject of the work where "the event depicted in the photograph, as distinguished from the fact that the photograph was made, is the subject of news stories. . ." 1 *Nimmer on Copyright,* § 1.10[c], p. 1–83.

At the outset, CBS' reliance on Nimmer appears misplaced, at least with reference to the film clips. They were used to illustrate Chaplin's artistic genius, not to communicate anything about the events depicted in the films, which were clearly fictitious. CBS argues, however, that the Compilation was essentially a news film which contributed to democratic dialogue by showing that the country had been deprived of this great artist's work by virtue of the McCarthy era's excesses. According to

---

**6.** CBS also presents the novel theory that plaintiffs had a duty to make the films available so that a fair use could be made and that plaintiff's failure to do so justified the use which CBS made. This position incorrectly assumes that a fair use can be made of every copyrighted work; the fair use doctrine, as far as our research indicates, has never been put to such reading, which would be totally at odds with the main thrust of the copyright laws insofar as they grant a monopoly to the copyright owner. Moreover, there was evidence to indicate that the films were available on video discs and cassettes, (Exhibits A to P, Exhibit 61) and that plaintiffs assisted a CBS associate producer in obtaining a Chaplin film print for research purposes. (Exhibits 13, 14, 20).

CBS, it had a First Amendment right to use the Compilation to communicate the detrimental effect that political extremism can have on a nation's cultural and artistic life. Finally, CBS concludes that the Academy Awards broadcast, marking the triumphant return of Chaplin to this country, constituted a remarkable occurrence, the newsworthiness of which justified CBS' use of the Compilation. CBS argues that, just as private rights have been subordinated to First Amendment considerations in such areas as libel law, e. g., *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), so the private copyright interests must give way here.

We need not decide whether on some set of facts the First Amendment may provide a separate defense from fair use, *see Wainwright, supra,* at 95, for this is clearly not the case. Assuming *arguendo* that CBS had a protected First Amendment interest in showing some of Chaplin's work in order to convey the idea that political extremism breeds repression of artistic endeavor, here CBS not only showed Chaplin's work, but also appropriated the skill and labor of the creators of the Compilation, who carefully selected, sequenced and edited the film clips. CBS' response that the showing of the Compilation at the Academy Awards presentation constituted an irreducible, audiovisual news event and thus entitled CBS to use it is singularly unpersuasive. The audiovisual news event, if there was one, was Chaplin's appearance, not the showing of his work, and certainly not the precise artistic means through which his films were showcased (the Compilation). Furthermore, the trial judge's instructions to the jury on fair use encompassed the contentions CBS makes here. The jury considered and rejected CBS' justification that its showing of the Chaplin films was essential to its biography, and CBS was unable to convince the jury that the public domain films would have been insufficient or that the public was so unfamiliar with Chaplin's work that even some use of his films was necessary. Moreover, there was ample evidence that CBS' use was in bad faith, *cf., New York Times v. Sullivan, supra,* suggesting that

First Amendment protection in this case would be inappropriate.

## IV. COMMON–LAW COPYRIGHT INFRINGEMENT

■ CBS contends that the common law infringement claim should have been dismissed. Common law copyright is an author's proprietary interest in his creation before it has been published, *Estate of Hemingway v. Random House, Inc.,* 23 N.Y.2d 341, 296 N.Y.S.2d 771, 776, 244 N.E.2d 250 (Ct.App.1967). The parties here agree that the showing of the Compilation during the Academy Awards show did not constitute publication and that it had not been published prior to the CBS use. CBS' first argument is that only artistic expressions which have been reduced to a tangible form may be protected by a common law copyright. Since the Compilation consists exclusively of complete scenes from films which are themselves copyrighted (the Chaplin films), it is argued that the Compilation cannot be the subject of a copyright because the common law copyright would then only protect the intangible skill, labor and talent utilized in bringing the scenes together.

■ This proposition misconceives the law. The requirement of tangible form does not mean that the intangible skill and thought reflected in the tangible object is not protected. It establishes only that a mere idea is not copyrightable: only a tangible work is. For example, in the instant case, if Bogdanovitch and his colleagues had merely had the idea of producing a compilation of Chaplin's scenes with a particular order and timing but had done nothing to realize the idea, CBS' use of that same order and timing of scenes would not have constituted an infringement of any common law copyright. However, once that idea had been embodied in tangible form, as it was in the Compilation, then the skill and talent of the producer is entitled to common law copyright protection, giving the creator the right to decide when the work should be first published. The skill, labor and talent

of Bogdanovitch et al. has in this case been embodied in a tangible form, the Compilation, and is thus protected under the common law copyright. *See Estate of Hemingway v. Random House, supra,* 296 N.Y.S.2d at 777, 244 N.E.2d 250.

■ Moreover, the fact that the Compilation contains previously copyrighted material does not mean that it is not itself the product of original creative endeavor. There was sufficient evidence that its makers selected particular scenes, arranged their order, timing, pacing and theme so as to produce a separate, individual creative expression. The trial court correctly instructed the jury that common law copyright protection for the Compilation turned on "whether the new work involves the input of original creativity and whether it has artistic value." (Tr. 1819). The jury reasonably concluded that the Compilation, while consisting of previously copyrighted parts, constituted a new whole. See 1, *Nimmer on Copyright,* § 3.02. CBS has cited *no case,* and we have found none, to support the proposition that the creative arrangement of portions of separately copyrighted works is not copyrightable. To the contrary, courts have routinely protected such efforts. *E. g., Jacobs v. Robitaille,* 406 F.Supp. 1145, 1149 (D.N.H.1978) (compilation of classified advertisements separately copyrightable); *New York Times Co. v. Roxbury Data Interface, Inc.,* 434 F.Supp. 217, 220 (D.N.J.1977) (copyright on correlation of separately copyrighted newspaper).

CBS next argues that even if a common law copyright might exist as to the Compilation, the fact that AMPAS owns the statutory copyright in the entire 1972 Academy Awards presentation (of which the Compilation was a part) precludes common law copyright protection for any portion of that presentation. CBS claims that only AMPAS has standing to sue for the alleged infringement, and that since AMPAS is not a plaintiff, the claim of infringement of the common law copyright on the Compilation should have been dismissed. CBS maintains, in essence, that a statutory copyright in the entirety of a work cannot coexist with a common law copyright in any portion of that work.

■ Again, CBS' argument is without merit. The Academy Awards program was a derivative or collective work composed of "separate and independent works ... assembled into a collective whole," *see* 17 U.S.C. § 101, in the same way as the Compilation itself is a collective work assembling the separate and independent film clips from the Chaplin films into a new, copyrightable work. And just as the authorization by the copyright owners of the Chaplin films for the use of excerpts in the Compilation does not affect their copyright interests in the Chaplin films, the license granted to AMPAS by the creators of the Compilation for one-time use on the Academy Awards broadcast does not affect plaintiffs' copyright interest in the Compilation. *Gilliam v. American Broadcasting Companies, Inc.,* 538 F.2d 14 (2d Cir. 1976). As Professor Nimmer states:

> "The copyright owner [the AMPAS program] of a derivative or collective work does not in such capacity obtain copyright in any pre-existing work [the Compilation] even though he may be licensed to incorporate such material in the derivative or collective work." 2 *Nimmer on Copyright,* § 7.16[B], p. 7–120.

■ CBS also asserts that AMPAS, and not plaintiffs, own the Compilation because plaintiffs were "employees for hire" or because AMPAS commissioned the work. However, despite the fact that AMPAS asked Schneider to prepare excerpts for use on the Academy Awards broadcast and that the editing and other costs were borne by AMPAS, there was insufficient evidence in this case from which to find a commission relationship. CBS submits that AMPAS exerted a right of control over the production of the Compilation by suggesting a particular excerpt in the Compilation be shortened. But as CBS admits, the evidence showed that Bogdanovitch refused to cut the scene as AMPAS requested. Thus, the crucial question of artistic control, *see Epoch Producing Corporation v. Killiam Shows, Inc.,* 522 F.2d 737, 744 (2d Cir. 1975),

must be resolved against CBS. Moreover, plaintiffs owned the underlying rights in the Chaplin films (the components of the Compilation), AMPAS never paid plaintiffs for use of the films or for the creative services of Schneider, Chaplin or Bogdanovitch, and, most significantly, plaintiffs gave AMPAS a one-time only license to broadcast the Compilation. As plaintiffs persuasively argue, if AMPAS owned the Compilation, they would not have sought a license from plaintiffs. An owner does not license his own use. In any event, ownership of a commissioned work turns on the intent of the parties, see *Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565, 567 (2d Cir. 1966). Here the fact that plaintiffs licensed the Compilation to AMPAS and retained creative control over the Compilation dictate the finding that the parties intended that plaintiffs would own the Compilation.

Finally, CBS claims that, if AMPAS did not own the Compilation, then Bogdanovitch, Pattersen and Schneider were, as the sole creator-authors, the joint owners rather than the plaintiffs. However, CBS provides no support for this contention. To the contrary, Schneider indicated that his work on the Compilation was on behalf of the plaintiff corporations (for which he was authorized to act), not for his own personal benefit. (Tr. at 239–41). Bogdanovitch testified that he worked on the Compilation as a favor to Schneider and Chaplin. (Tr. at 1616). In short, there is simply no basis to believe that Schneider, Bogdanovitch or Pattersen believed that they, rather than the companies Schneider represented, would own the Compilation.

## V. FEDERAL PREEMPTION OF THE UNFAIR COMPETITION CLAIM

■ Under the unfair competition claim, the jury awarded plaintiffs compensatory damage for harm to their derivative work, "The Gentleman Tramp," as well as punitive damages. With respect to the statutory copyright claim, it has been determined that the trial court properly instructed the jury to consider harm to the deriva-

tive work in determining the applicability of the fair use defense. Here we consider CBS' independent argument that the unfair competition claim should have been dismissed because it was federally preempted by the copyright statute.

In *Sears, Roebuck & Co. v. Stiffel Lamp Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), the Supreme Court decided that a state could not, through the law of unfair competition, impose liability for the copying of a product which does not meet the federal criteria for patent protection. The Court held that an unfair competition claim involving the copying of a pole lamp design by a competitor was federally preempted. The Court stated, "the patent system is one in which federal standards are carefully used to promote invention while at the same time preserving free competition." *Sears, supra*, at 230–31, 84 S.Ct. at 788. Since the pole lamp at issue had been held not to be entitled to patent protection for want of invention, plaintiff's design could be copied without violating the federal patent laws. "To allow a State by use of its law of unfair competition to prevent copying of an article which represents too slight an advance to be patented would be to permit the State to block off from the public something which federal law has said belongs to the public." *Sears, supra* at 232, 84 S.Ct. at 789. The same result was reached in *Compco Corporation v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

The *Sears-Compco* doctrine was qualified somewhat in *Goldstein v. California*, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973), *reh. denied*, 414 U.S. 883, 94 S.Ct. 27, 38 L.Ed.2d 131 (1974). There the Court upheld a state law which protected musical recordings from unauthorized copying, although the federal copyright law did not protect such recordings. The *Sears* and *Compco* cases were distinguished by the fact that in *Goldstein* the lack of federal protection was not due to a failure to meet federal standards for protection; rather, the Court found that Congress had left this category of "writing" unattended and thus

state protection did not conflict with "the careful balance which Congress had drawn" with respect to federally protected works. *Goldstein, supra,* 412 U.S. at 570, 93 S.Ct. at 2316.[7]

. It is at least clear that the unfair competition claim in the present case does not fit squarely under the *Sears-Compco* doctrine. By allowing compensatory and punitive damages for harm to a derivative work, the law of unfair competition as applied in this case did not provide protection for works which failed to meet federal standards for copyright protection; to the contrary, the Chaplin films were protected from unauthorized copying under the federal copyright statute and the Compilation was protected under common law copyright.[8] *See F.E.L. Publications v. National Conference of Catholic Bishops,* 466 F.Supp. 1034, 1046 (N.D.Ill.1978). CBS claims, however, that damage caused by the copying of the Chaplin films was *exclusively* cognizable under the federal copyright statute and therefore could not form the basis for a state unfair competition claim.

Plaintiffs respond that CBS' arguments are inapposite because the unfair competition claim related to harm to the derivative work, "The Gentleman Tramp" which was not claimed to have itself been infringed. However, the harm to plaintiffs' derivative work was cognizable under the statutory copyright claim. To the extent that CBS' infringement of plaintiffs' copyrights in the Chaplin films caused consequential harm to plaintiffs' derivative work, "The Gentleman Tramp," that harm could have been compensated along with direct harm to the Chaplin films themselves under the federal copyright statute. *See* 1 *Nimmer on Copyright,* § 3.05, pp. 3–17, 3–19. Thus, the fact that the unfair competition claim does not rest on infringement of "The Gentleman Tramp" is not dispositive if the claim does rest solely on the infringement of plaintiffs' copyrights in the original Chaplin films.

CBS maintains that the unfair competition claim in this case protects the same interests vindicated by the federal copyright claims because both rest on the fact that CBS used plaintiffs' copyrighted works without authorization. If this premise were correct, there would be a serious question whether the award of punitive damages, available under the unfair competition claim but not under the statutory copyright claim, provided *greater* protection to copyrighted works than permitted by "the careful balance which Congress [has] drawn" with respect to federally protected works. *Goldstein, supra,* 412 U.S. at 570, 93 S.Ct. at 2316. However, while the question is not easy, we conclude that the state and federal causes of action here are sufficiently dissimilar so that the state law does not stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Goldstein, supra,* at 561, 93 S.Ct. at 2312, *quoting Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941); *see also Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 479, 94 S.Ct. 1879, 1885, 40 L.Ed.2d 315 (1974); *Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562, 577, 97 S.Ct. 2849, 2858, 53 L.Ed.2d 965 (1977); 1 *Nimmer on Copyright,* § 1.01[B], p. 1–11 (1979).

The federal copyright statute protects copyrighted works against mere copying, even when done in good faith and even when not done to obtain a competitive advantage over the owners of the copyrights in the infringed works. The New York law of unfair competition, on the other hand, bans "any form of commercial immorality." *Metropolitan Opera Association v. Wagner-Nichols Recorder Corp.,* 199 Misc. 786, 101 N.Y.S.2d 483, 492 (Sup.Ct. N.Y.Cty. 1950), *aff'd,* 279 App.Div. 632, 107 N.Y.S.2d 795 (1st Dept. 1951). *See International News Service v. Associated Press,* 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918). A

---

**7.** It has been noted that "the law of preemption in this area [is] in a state of disarray." *Orth-O-Vision, Inc. v. Home Box Office,* 474 F.Supp. 672, 683 n.11 (S.D.N.Y.1979). For an excellent discussion, see *Orth-O-Vision* at 683–84.

**8.** The 1909 Act left protection for unpublished works to the states. *See* 1 *Nimmer on Copyright,* § 2.02.

cause of action for unfair competition requires unfairness and an unjustifiable attempt to profit from another's expenditure of time, labor and talent, elements which are not required to state a cause of action under the copyright statute. While it is true that the same evidence of bad faith which may have reasonably been found to have negated CBS' fair use defense to the statutory copyright infringement claim would constitute the requisite unfairness under the unfair competition claim, the fair use defense is an affirmative defense, as CBS recognizes (Tr. at 1860); on the other hand, plaintiffs bore the burden of proving unfairness with respect to the unfair competition claim. Moreover, a substantial element in CBS' misconduct was the taking of virtually the entire Compilation. Most of the statutory copyright infringement claims arise from the fact that the Compilation contained statutorily protected work. But the Compilation itself was protected only by *state* law, and CBS does not contend that the state law of common law copyright somehow preempts the state law of unfair competition. Given the facts of this case, it is reasonable to conclude that the finding of unfair competition was based primarily on the use of the Compilation and the fact that the use of the Compilation necessarily entailed an infringement of statutory copyrights in the original films added little if anything to the evidence supporting the finding of unfair competition.

■ In sum, while the finding of unfair competition may have been based *in part* on the fact that CBS used plaintiffs' copyrighted works without authorization, it also required a finding that CBS' conduct constituted commercial immorality and thus was also based on the evidence of bad faith presented in the case. (See pp. 1146–1147, *supra*.) The fact that the basis for the finding of unfair competition may have partly overlapped the basis for the finding of statutory copyright infringement is insufficient to find the unfair competition claim preempted where, as here, the law of unfair competition serves to compliment, rather than conflict with, federal law. *F.E.L. Publications, supra.*

## VI. THE PRIOR AUTHORIZATION DEFENSE

■ CBS claims that plaintiffs' representatives had authorized it to use excerpts from "Modern Times" and "City Lights" and that such authorization presented no issue of fact, thus the statutory copyright infringement claims with respect to these two films should not have been submitted to the jury. CBS bases its argument on a March, 1972 letter agreement between CBS and Columbia Pictures (the United States theatrical distributors for the Chaplin films at that time) which granted CBS "in perpetuity, the irrevocable, non-exclusive right to use and exploit the footage as part of the above captioned broadcast, or any expanded, abridged or changed version thereof, in any manner and in any media whatsoever throughout the world." (Def. Ex. V).

CBS concedes that "the above captioned broadcast" referred to the "60 Minutes" program. It maintains, however, that the contractual language, by permitting "changed versions" of the "60 Minutes" broadcast, unambiguously authorized CBS to use the footage in question in its obituary tribute, "Chaplin." However, as plaintiffs contend, "60 Minutes" was a weekly prime time program with a regular cast and format; "Chaplin" was a special, one-time, late night obituary. The jury could have reasonably concluded that "Chaplin" was not an "expanded, abridged or changed version" of "60 Minutes." And, since the contractual language was ambiguous, the trial judge was correct in admitting parol evidence with respect to the parties' intent and in allowing the trier of fact to resolve the question. *Geary v. Data Development Corp.*, 62 A.D.2d 1083, 403 N.Y.S.2d 600, 602 (3d Dept. 1978); *67 Wall Street Co. v. Franklin National Bank*, 37 N.Y.2d 245, 371 N.Y.S.2d 915, 918, 333 N.E.2d 184, 186 (Ct. App.1975).

■ CBS also argues that Columbia and Classic Films (the United States theatrical distributor after Columbia which granted CBS a similar license) had authority to

grant CBS a license "in perpetuity" to use the film clips on television. However, as plaintiffs point out, under their distribution agreements Columbia and Classic Films were only theatrical distributors; their right to license the use of excerpts on television was limited to promotional broadcasts "in connection with exhibition for theatrical broadcasts." (Def. Ex. H ¶ 3(b); L, ¶ 1, p. 4). The jury could reasonably have concluded that Columbia and Classic Films had no authority to license CBS' use of the films in connection with its obituary tribute. CBS points to no evidence that its use of the two films was "in connection with" any theatrical exhibition of the films at the time Chaplin died. (Tr. 909–18). Whatever controversy may exist with respect to the right of a copyright owner or distributor to convey his copyright interests through perpetual licenses, *compare Rohauer v. Killiam Shows, Inc.*, 551 F.2d 484 (2d Cir.), *cert. denied*, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977) *with* 1 *Nimmer on Copyright*, § 3.07[A], it is axiomatic that no one can convey *more* than his own interest in a work. *See Gilliam v. American Broadcasting Companies*, 538 F.2d 14 (2d Cir. 1976).

▮ Finally, the Columbia license pertained to specific footage from "City Lights" and "Modern Times." CBS, in its obituary special, used additional film clips from the two films besides those purportedly licensed. (PTO ¶ 64).[9]

### VII. PUNITIVE DAMAGES

▮ CBS challenges the punitive damage awards in this case first on the basis that, under New York law, punitive damages can only be awarded for a wrong aimed at the public generally, relying on *Walker v. Sheldon*, 10 N.Y.2d 401, 223 N.Y. S.2d 488, 179 N.E.2d 497 (Ct.App.1961). We recently considered and rejected this proposition in *Banco Nacional De Costa Rica v. Bremar Holdings*, 492 F.Supp. 364 (S.D.N.Y. 1980). As we noted there, the New York Court of Appeals has addressed the issue since *Walker* and made it clear that proof of "gross, wanton, or willful fraud or other morally culpable conduct," even when not directed at the public generally, will support an award of punitive damages. In *Borkowski v. Borkowski*, 39 N.Y.2d 982, 387 N.Y.S.2d 233, 355 N.E.2d 287 (Ct.App.1976) (mem), the Court of Appeals pronounced that

> "it is not essential, as the Appellate Division stated, that punitive damages be allowed in a fraud case only where the acts had been aimed at the public generally."

*See also, Chase Manhattan Bank, N.A. v. Perla*, 65 A.D.2d 207, 411 N.Y.S.2d 66, 69 (4th Dept. 1978) (punitive damages "may be awarded when the proof establishes that [defendant's] conduct is gross, wanton, or willful"); *Greenspan v. Commercial Insurance Co.*, 57 A.D.2d 387, 395 N.Y.S.2d 519, 520–21 (3d Dept. 1977) ("[a] cause of action for punitive damages in the absence of 'public fraud' does exist...."). As we understand the current New York law on the subject, punitive damages are appropriate where "the wrong is aggravated by evil or a wrongful motive or [where] there was willful and intentional misdoing or a reckless indifference equivalent thereto." *Le Mistral, Inc. v. CBS*, 61 A.D.2d 491, 402 N.Y. S.2d 815, 817 (1st Dept. 1978), *appeal dismissed*, 46 N.Y.2d 940 (1979).

▮ CBS next contends that punitive damages should not have been awarded be-

---

**9.** CBS also challenges the $380. award for statutory copyright infringement of "The Gold Rush" on the ground that, since the visual portion of the film is in the public domain, its 1½ minute use of the music soundtrack was insubstantial as a matter of law, and thus plaintiffs did not make out a prima facie case with respect to "The Gold Rush." However, plaintiffs' copyright protects not only the right to use the soundtrack itself, but also the right to use it in synchronization with the film for which it was written. *Schroeder v. William* *Morrow & Co.*, 566 F.2d 3, 6 (7th Cir. 1977); *Hartfield v. Peterson*, 91 F.2d 998, 1000 (2d Cir. 1937). In light of the evidence that the particular scene used (of Chaplin cooking and eating his shoe) was qualitatively important in the context of the entire film and that the music was important to the scene (Tr. at 1594–95), the jury, which saw both the CBS broadcast and "The Gold Rush", could reasonably have determined that CBS' use of the film was substantial.

**1154**

cause the management official responsible for the relevant decisions, Richard Salant, did not know that plaintiffs had not authorized CBS to use its copyrighted material and thus CBS' conduct was not gross, wanton or willful. However, there was ample evidence that Russell Bensley, Director of CBS' Special Events Unit, knew that CBS had no permission to broadcast plaintiffs' copyrighted material, see *Doralee Estates v. Cities Service Oil Co.*, 569 F.2d 716, 722 (2d Cir. 1977). Moreover, Salant himself testified that he would have taken the same action even if he had known of plaintiffs' objections (Tr. at 942). And there was evidence that Salant ignored both his own written guidelines and a "caution flag" in authorizing the broadcast. (Tr. 963–66; Pl. Ex. 77, p. 36). The jury could therefore have reasonably found that CBS acted with reckless indifference to plaintiffs' rights. The trial judge's instruction that such indifference is a sufficient predicate for punitive damages was correct under *Le Mistral, supra.*

 ▮ CBS asserts that amount of the punitive damage awards, ($410,000.) is excessive. The jury's assessment of punitive damages, however, "is properly within the discretionary province of the jury, and will be overturned only if 'shockingly' or 'grossly' excessive." *Doralee Estates v. Cities Service Oil Co., supra,* at 722, *quoting Faulk v. Aware Inc.*, 19 A.D.2d 464, 244 N.Y.S.2d 259 (1st Dept. 1963), *aff'd* 14 N.Y.2d 899, 252 N.Y.S.2d 95, 200 N.E.2d 778, *modified* 14 N.Y.2d 954, 253 N.Y.S.2d 990, 202 N.E.2d 372 (1964), *cert. denied*, 380 U.S. 916, 85 S.Ct. 900, 13 L.Ed.2d 801 (1965). Since deterrence is one of the central purposes of a punitive damage award, see *Walker v. Sheldon, supra,* 10 N.Y.2d 401, 223 N.Y.S.2d at 491, 179 N.E.2d 497; *Doralee, supra,* at 723, and since CBS is "the largest advertising medium in the world" (Pl. Ex. 51), the total

punitive damage award of $410,000. was not in excess of the jury's authority. "To function effectively, the award must be 'of sufficient substance to smart . . . the offender.' " *Doralee*, supra, at 723, *quoting Reynolds v. Pegler*, 123 F.Supp. 36, 41 (S.D.N.Y. 1954), *aff'd* 223 F.2d 429 (2d Cir.), *cert. denied*, 350 U.S. 846, 76 S.Ct. 80, 100 L.Ed. 754 (1955). Nor, as CBS suggests, must punitive damages bear a proportionate relationship to compensatory damages, *see Doralee, supra,* (affirming punitive damage award which was more than triple the compensatory damage award); *Reynolds v. Pegler, supra,* ($1. nominal and $175,000. punitive damages).[10]

 ▮ Finally, CBS maintains that the punitive damage awards on the unfair competition claim and on the common law copyright infringement claim are duplicative in that both awards redress injury to the plaintiffs' derivative work, "The Gentleman Tramp." However, contrary to CBS' assertions, any award for injury to "The Gentleman Tramp" was compensatory, not punitive. The special verdict returned by the jury here clearly distinguished both between compensatory and punitive damages and between the unfair competition and common law copyright infringement claims. Given the lack of evidence that the Compilation (the subject of the common law copyright) was commercially impaired by CBS' infringement, the jury awarded only $1. in compensatory damages. Its award of $300,000. in punitive damages reflects a finding that CBS' appropriation of the skill and labor which plaintiffs had invested in the Compilation, while not causing plaintiffs future economic injury, constituted gross, wanton or willful conduct. On the other hand, there was ample evidence that "The Gentleman Tramp" (the subject of the unfair competition claim) was commercially

---

10. CBS maintains that the "disproportionate" punitive damage award was made because the jury was "severely prejudiced" by plaintiffs' statement during opening argument that the CBS Broadcast Group's 1977 earnings exceeded $217,000,000. (Tr. at 70; Defendant's Brief at 108). But the award was not excessive, as noted above. Moreover, the trial judge made a cautionary remark about the statement (Tr. at 70–71). And the jury must have known from common experience that CBS is a corporate giant; if it didn't, then CBS' 1976 annual report, admitted into evidence without objection, at least informed them that CBS was the "largest advertising medium in the world." (Pl. Ex. 51).

impaired by what the jury found to be CBS' unfair competition, hence the compensatory award of $300,000. on the unfair competition claim. Again, the punitive damage award reflects a jury finding that CBS' various unfair practices were egregious enough to warrant exemplary damages. In short, there is nothing to support CBS' speculation that both awards were made to compensate for injury to "The Gentleman Tramp." To the contrary, the special verdict reveals that this jury was especially conscientious in heeding the trial judge's careful instructions with respect to damages.

\* \* \* \* \* \*

After careful consideration, we find CBS' challenges to the trial court's jury instructions and rulings on the admissibility of evidence to be without merit. CBS' motion for judgment notwithstanding the verdict and for a new trial is denied.

## VIII. ATTORNEYS FEES AND DAMAGES IN LIEU OF JURY AWARD

Plaintiffs move for an award of attorneys fees under U.S.C. § 116 and Rule 37 of the Fed.R.Civ.Pr. They also move under 17 U.S.C. § 101(b) for damages in lieu of the amount awarded by the jury on the statutory copyright infringement count.

### A. Attorneys Fees

Both under 17 U.S.C. § 116 and Rule 37 the award of attorneys fees is within the discretion of the court. Plaintiffs contend that they are entitled to such an award because 1) CBS' infringement was deliberate; 2) CBS clearly increased plaintiffs' expense of litigation by dilatory tactics and uncompromising positions, and 3) the plaintiffs assumed a substantial risk and expense in prosecuting this suit.

There is no doubt that CBS' infringement was deliberate. When CBS used plaintiffs' materials it knew that they were copyrighted and that permission to use them had been denied. The question whether the infringement exhibited "bad faith and moral blame" (as contended by the plaintiffs) is considerably less clear. It is arguable that the jury's verdict granting punitive damages is a finding on their part that the defendant acted in bad faith. But that is not the end of the matter. In deciding whether an award of attorneys fees is appropriate, a determination of bad faith depends not only on whether a defendant deliberately used copyrighted material which it had been denied permission to use, but also on whether the defendant genuinely believed that, nevertheless, it had the legal right to make such use. Put another way, the issue of good faith or bad faith in this context depends in large part on the substantiality of the defense offered as justification for the offending acts. In this case, that question turns on the substantiality of CBS' theories of fair use, protection under the First Amendment, inapplicability of common law copyright to the case at hand and preemption by federal law of the unfair competition claim. While the disposition of CBS' motion to set aside the verdict decides all of those issues against it, nevertheless it cannot be said that the issues thus presented were insubstantial. We conclude that although CBS' defenses proved to be without merit, they were of sufficient substance to negate a finding that its conduct was in bad faith or morally culpable, at least for the purposes of awarding attorneys fees.

Both sides have submitted exceptionally voluminous affidavits and documentation on the question whether CBS deliberately engaged in dilatory tactics or took uncompromising positions which resulted in unnecessary expense of litigation. Supplemented by letters from counsel to the court, and by oral argument, this material has conveyed the "feel" of the litigation. The picture that emerges is one in which zealous counsel on each side pressed or defended the rights of their respective clients in a manner which regrettably has become the norm: time consuming and expensive pretrial discovery, including occasional serious disagreements between counsel which have to be decided by the court. Upon objective analysis of the evidence, however, it cannot be said that plaintiffs have established that

the behavior of defense counsel was deliberately and unnecessarily dilatory or that defense counsel's behavior unjustifiably contributed to plaintiffs' trial expense.

Plaintiffs' final argument in support of its request for attorneys fees is that such fees should be awarded because it took substantial risk in prosecuting the lawsuit. While there is no doubt that plaintiffs' expense (approximately $250,000.) has been considerable, its rewards from the litigation have been proportionate. A jury award of $410,000. in punitive damages goes far to recompense the plaintiffs for the risks taken.

While under the Act the award of attorneys fees is discretionary with the court, the Court of Appeals has pointed out that

"Since such a provision for attorney's fees is at variance with the usual practice in litigation before our courts, however, it has been sparingly used and the amounts awarded modest."

*Orgel v. Clark Boardman Co.* 301 F.2d 119, 122 (2d Cir. 1962).[11] *See also, Norbay Music, Inc. v. King Records, Inc.,* 249 F.Supp. 285 (S.D.N.Y.1966); *Kinelow Publishing Co. v. Photography in Business, Inc.,* 270 F.Supp. 851 (S.D.N.Y.1967); *Breffort v. I Had a Ball Co.,* 271 F.Supp. 623 (S.D.N.Y. 1967) and 3 *Nimmer on Copyright,* § 14.-10[D] (1979 ed.).

Consistent with this philosophy the court had in an earlier case denied attorneys fees where the losing party (plaintiff in that case) had in good faith raised substantial legal issues. *Edward B. Marks Music Corp. v. Continental Record Co.,* 222 F.2d 488 (2d Cir. 1955). That philosophy has been followed in this court in such cases as *Morser v. Bengor Products Co., Inc.,* 283 F.Supp. 926, 929 (S.D.N.Y.1968).

For the reasons indicated, this case appears to fall in the category of the cases cited, and accordingly plaintiffs' motion for an award of attorneys fees is denied.

*B. Damages In Lieu of the Jury Award*

Under 17 U.S.C. § 101(b), the copyright owner is entitled to recover both compensatory damages and "all the profits which the infringer shall have made from such infringement . . . or in lieu of actual damages and profits, such damages as to the court shall appear to be just . . ." The case law of this Circuit dictates that "where profits are not actually ascertained, or where damages are not proved, 'in lieu' statutory minimum damages *must* be awarded." *Robert Stigwood Group, Ltd. v. O'Reilly,* 530 F.2d 1096, 1101 n.11 (2d Cir. 1976) (emphasis in original), *cert. denied,* 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976). *See, also, Lottie Joplin Thomas Trust v. Crown Publishers,* 592 F.2d 651, 657 (2d Cir. 1978); *Peter Pan Fabrics, Inc. v. Jobela Fabrics, Inc.,* 329 F.2d 194, 197 (2d Cir. 1964).

Plaintiffs argue for a statutory award in addition to the damage award made by the jury on the grounds that (1) CBS' infringement was willful, (2) CBS benefited substantially from the infringement, and (3) the jury award did not fully compensate plaintiffs because it did not redress injury to their derivative work, "The Gentleman Tramp." Plaintiffs, however, do not provide any support (nor do we find any) for the proposition that CBS' willfulness alone warrants an additional damage award. Nor are we persuaded by the argument that an additional statutory damage award is necessary to compensate plaintiffs for injury to "The Gentleman Tramp." The ample compensatory damage award under the unfair competition claim was directed at harm to "The Gentleman Tramp" caused in part by CBS' infringement of plaintiffs' statutory copyrights. We do find, however, that CBS' profits from its infringement of plaintiffs' copyrights in the six films cannot be "actually ascertained" since the benefit retained by CBS resulting from its presentation of "Chaplin" and the increased audience enjoyed by the network during that time period consists of unmeasurable good-

---

11. The *Orgel* quotation cites Copyright Law Revision Studies prepared for the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary, Eighty-sixth Congress, Second Session.

will with its affiliates and increased stature and prestige vis a vis its competitors. A statutory damage award is therefore appropriate.

Plaintiffs contend that fourteen separate infringements occurred. According to plaintiffs, CBS infringed two of the copyrighted films when it prepared the "rough cut," and infringed all six films both when it copied and transmitted the Academy Awards program on December 25, 1977, and when it broadcast its special the next night. CBS claims that only one infringement occurred because the use of the films occurred in a single broadcast on a unified theme and thus the use of the films was homogeneous under the "heterogeneity" test, *see Davis v. E. I. DuPont de Nemours & Co.*, 249 F.Supp. 329, 337 (S.D.N.Y.1966) ("a single integrated business transaction would result in one infringement...."). *Davis*, however, refers to multiple uses of a single copyrighted work. While infringement of overlapping copyrights of an entire work should be considered as a single infringement, *O'Reilly, supra* at 1102, CBS infringed six separate copyrights in six separate films, none of which were overlapping, and thus its contention that only one infringement occurred is difficult to accept. *See 3 Nimmer on Copyright*, § 14.04[E]. In the circumstances of this case, it is unclear whether the preparation of the "rough cut," the copying of the Academy Awards program, and the actual broadcast should be treated as separate acts of infringement. While the copying and the broadcast of a copyrighted film were treated as separate infringements in *Iowa State Research Foundation, Inc. v. American Broadcasting Companies, Inc.*, 475 F.Supp. 78 (S.D.N.Y. 1979), here it is not at all clear whether the copying one day and broadcast the next day of the Compilation constituted a single business transaction under the "heterogeneity" test or one act under the "time" test, which looks to the amount of time which elapsed between separate acts. *Baccaro v. Pisa*, 252

F.Supp. 900 (S.D.N.Y.1966). However, we need not decide this issue, nor whether the "rough cut" constituted two additional infringements, since we find that, in light of the total verdict, the compensatory and therapeutic deterrent purposes of the Copyright Act are served by an additional award of statutory damages of $5,000., which is within the statutory maximum if six infringements occurred and within the statutory minimum if fourteen infringements occurred.[12] This amount serves the statutory purpose of granting additional relief when an element of damages is incapable of actual ascertainment at trial while avoiding an indiscriminate application of the multiplier which could, especially in light of the total verdict in this case, lead to a "ridiculous and injurious award." *Davis, supra* at 343–44.

\* \* \* \* \* \*

In sum, CBS' motion for a judgment notwithstanding the verdict and for a new trial is denied, plaintiffs' motion for an award of attorneys fees is denied and plaintiffs' motion for an additional award under 17 U.S.C. § 101(b) is granted in the amount of $5,000.

It is so ordered.

---

**12.** In light of this disposition, we make no ruling on plaintiffs' claim that the statutory maximum may be exceeded here because plaintiffs gave CBS written notice that it could not use the copyrighted films. There is, of course, no requirement that the statutory maximum be exceeded whenever written notice was provided under the statute. *Alouf v. Expansion Products, Inc.*, 417 F.2d 767 (2d Cir. 1969).